690 A.2d 1051

CAMECO, INC., PLAINTIFF–APPELLANT, v. DONALD GEDICKE, INDIVIDUALLY AND D/B/A NEWTON TRANSPORT SERVICE, NEWTON TRANSPORT SERVICE AND PRISCILLA MUELLER, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 11, 1997—Decided March 31, 1997.

Before Judges MICHELS, MUIR, Jr. and COBURN.

*Robert P. Donovan* argued the cause for appellant (*Fox and Fox*, attorneys; *Mr. Donovan*, of counsel and on the brief).

*James F. Keegan* argued the cause for respondents (*Bendit, Weinstock & Sharbaugh,* attorneys; *Mr. Keegan,* of counsel; *Mr. Keegan, Sherri Davis Fowler,* and *Shari T. Competiello* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiff Cameco, Inc. (Cameco) appeals from a judgment of involuntary dismissal of the Law Division entered in favor of defendants Donald Gedicke, individually and d/b/a Newton Transport Service (Gedicke), Newton Transport Service (Newton), and Priscilla Mueller (Mueller) at the conclusion of its proofs in this action to recover damages on theories of breach of fiduciary duty and loyalty, conversion, unjust enrichment, and tortious interference with its contractual rights and economic advantage.

The proofs presented on Cameco's case show that Cameco imports, packages, and delivers food products including ham, fish, and poultry. Cameco delivers its products through the use of outside common carrier trucking companies. Cameco's shipping costs constitute approximately fifteen percent to twenty percent of its operating expenses. Gedicke was employed by Cameco for nearly nine years, from March 1984 to January 1993, as its sole traffic warehouse manager. Gedicke's duties included, among other things, arranging for the shipments of Cameco's goods by common carrier. Gedicke arranged routine shipments from Cameco's warehouse where he scheduled when various common carriers would arrive to pick up Cameco's products for delivery. Consequently, Gedicke was aware of Cameco's delivery rates, its delivery routes, the identity of its customers, and the identity of its common carriers. Cameco considered this information confidential, and it never gave Gedicke permission to use it for any purpose other than discharging his duties as a Cameco employee.

In July 1990, Gedicke and Mueller established Newton, a trucking brokerage business operating from their residence. Mueller, who was not employed outside the home, was primarily responsi-

ble for running Newton, but she generally relied upon Gedicke's superior knowledge. Gedicke himself participated on nights and weekends. At least fifty percent of Newton's business was conducted between 8:00 a.m. and 5:00 p.m., hours between which Gedicke was generally at work. The work Gedicke and Mueller did with Newton was identical to the work Gedicke did for Cameco.

Newton was in the truck brokering business. It arranged for the transportation of goods for third parties on a commission basis. Newton would contract with a person or entity, often the traffic manager, wishing to have goods shipped. It would then contract with a trucker to ship those goods. Newton would be paid by the shipper and billed by the trucker. Newton paid the trucker out of its payment from the shipper, minus Newton's commission.

Gedicke employed the knowledge he gained at Cameco, including knowledge as to truckers, rates, and routes, in his operation of Newton. In over 600 instances, Gedicke/Newton had arranged for a trucker transporting Cameco's goods to also transport goods for Newton's customers. The trucker would transport both Cameco's goods and Newton's goods, sometimes to the same destination. Gedicke testified that this was normal with common carrier truckers because they would transport goods originating from various sources. Even after Gedicke was no longer employed by Cameco, goods brokered by Newton would be transported to a destination with goods from Cameco.

Gedicke arranged to have the truckers, which he used as Cameco's traffic manager to transport Cameco goods, transport goods for Newton from other food distribution businesses like Cameco. At least two of those other food distribution businesses, Atalanta Corporation and Kohler Delicatessen Meats, were "direct" competitors of Cameco. Gedicke knew at least that Atalanta Corporation was a competitor of Cameco. Moreover, Gedicke was also in contact with the purchasers of these products, that is, with the entities which were buying Cameco's and Atalanta Corporation's products. Gedicke was arranging for Cameco's customers

to receive goods both from Cameco and from Cameco's competitors via the same common carrier trucker.

Gedicke admitted that sometimes he would arrange for the goods contracted through Newton to be delivered before Cameco's goods when both of those shipments were being transported by the same common carrier. Gedicke claimed that because of the location of the deliveries and the route the trucks were following, sometimes this arrangement made practical sense and Cameco's goods did not suffer by it. Additionally, sometimes Cameco's goods would be picked up before Newton's customers' goods and thereby, the product information contained on Cameco's packaging/labeling would be exposed to Newton's customers, some of whom were competitors.

During the course of his employment at Cameco, Gedicke used Cameco's telephone to operate Newton by calling his own customers (the other food distribution businesses), the truckers, and the companies receiving the goods. Gedicke paid for the calls himself by making them through the use of his telephone credit card. Gedicke prepared an analysis of the phone records of the calls he had made from Cameco between July 1990 and November 1992. Based on a regular work schedule, eight hours a day, five days a week, (that is, ignoring any additional overtime hours he may have worked, but also vacation time), Gedicke made 13.8 minutes of calls per day, including personal calls. Though the calls averaged only 13.8 minutes a day, it is not known how many minutes a day Gedicke spent on incoming calls relating to Newton.

Gedicke also admitted to having informal meetings relating to Newton's business with truckers who had arrived at Cameco to pick up Cameco's goods. He never told anyone at Cameco or any of his customers that he was employed with both businesses because he felt no need to tell them. He admitted that until July 1993, he was operating without an ICC license, but claimed that he did not need a license because he was working under the authority of the truckers.

In August 1992, Cameco reprimanded Gedicke because he had failed to regularly inspect off-site warehouses, a duty which attached to his position. However, Gedicke denied that his failure in that respect was caused by or connected to his participation in Newton. Jerry Perl (Perl), Cameco's president, testified that he did not know why Gedicke had failed to inspect the warehouses, but thought Gedicke had told him he had been too busy or had forgotten.

Gedicke testified that his participation in Newton did not in any way interfere with his duties at Cameco. In fact, Gedicke regularly worked unpaid overtime at least three days a week and, according to an analysis he had prepared, Cameco saved money because of Newton. The additional freight that Newton placed on the trucks enabled Cameco to negotiate a lower transport rate from the trucker. Instead of having to pay the rate for a truck which is less than fully loaded or even the rate for a full truck load, Cameco paid less than the full truckload rate.

Gedicke was discharged by Perl on January 18, 1993, after Cameco had become dissatisfied with his performance. Specifically, Perl was dissatisfied with Gedicke's failure to negotiate lower freight rates for Cameco, his failure to inspect Cameco's off-site warehouses, and the increased amount of overtime he and his subordinates were working. Cameco allegedly was not aware that Gedicke had been operating his own trucking business while he was employed at Cameco. However, after Gedicke was discharged, Cameco demanded that Gedicke sign a covenant not to compete. Apparently, Cameco had a policy that persons leaving their employment must sign a covenant in order to have their pension and/or profit sharing funds turned over or released to them. Gedicke signed the agreement.

Within two weeks of Gedicke's discharge, Cameco learned of the existence of Newton from a trucker with which Cameco routinely contracted. Also, two of Cameco's normal truckers allegedly dropped their rates for Cameco, but Gedicke disputed that the alleged decrease was connected to him or Newton, claiming in-

stead that it was market oriented. According to Scott Maier, a certified public accountant presented by Cameco as an expert witness, fifty-four percent of Newton's total reported gross receipts from 1990 to 1992 were from shipments which also included Cameco goods. He also estimated that approximately thirty-nine percent or $10,141 of Newton's net profits were from shipments which included Cameco goods. However, Cameco admittedly never engaged in the truck brokering business.

At the conclusion of Cameco's proofs, Gedicke moved for a judgment of involuntary dismissal pursuant to *R.* 4:37-2(b). The trial court believed Gedicke's testimony and found as a fact that "most of the work that was performed in ... connection [with Newton] was performed by his wife at home and by him primarily on weekends and times when he was at home in the evenings.... [H]e stayed on well beyond the time that he was required to be employed ... [and] at most he diverted 15 minutes a day towards" Newton. The trial court also found that Perl "exaggerated ... what constitutes any kind of competition with his business." The trial court also found that Gedicke had not breached his duty of loyalty.

As to Gedicke's duty as an employee not to compete, the trial court did not find "that there was anything that was done by [Gedicke] that was competition." Because of Gedicke's employment at Cameco, he "did gain a lot of experience and knowledge which permitted him to set up another business which the Court finds as I said before did not compete with the plaintiff's business." As to Gedicke's duty as an employee "not to act or to agree to act during the period of his agency for persons whose interest[s] conflict with those of [his] principle and ... matters in which [he] is employed," the trial court found that Gedicke "did not do anything that violates that" duty. The trial court thereupon concluded that Cameco failed to establish a cause of action and granted Gedicke's motion for an involuntary dismissal. This appeal followed.

Cameco seeks a reversal of the judgment and a remand for a new trial before a different trial judge, contending that (1) it

established a *prima facie* case against Gedicke for a breach of the duty of loyalty, conversion, and unjust enrichment, and (2) the trial court improperly weighed the evidence and made factual findings and credibility determinations which mandate a new trial.

We are satisfied from our study of the record and the arguments presented that the trial court erred in granting the motion for a judgment of involuntary dismissal against Gedicke, Newton, and Mueller based on the theory of breach of the duty of loyalty. *R.* 4:37–2(b), which addresses judgments of involuntary dismissal at trial, provides:

> After having completed the presentation of the evidence on all matters other than the matter of damages (if that is an issue), the plaintiff shall so announce to the court, and thereupon the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal of the action or of any claim on the ground that upon the facts and upon the law the plaintiff has shown no right to relief. Whether the action is tried with or without a jury, such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor.

The test to be followed in ruling on a motion for a judgment of involuntary dismissal was clearly set forth by our Supreme Court in *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969) (citations omitted), as follows:

> In the case of motions for involuntary dismissal, the test is, as set forth in *R.* 4:37–2(b) and equally applicable to motions for judgment, whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor" of the party opposing the motion, *i.e.,* if, accepting as true all the evidence which supports the position of the party defending against the motion and according [the party] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. The point is that the judicial function here is quite a mechanical one. The court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.

The standard set forth in *Dolson v. Anastasia, supra,* for determining a motion for an involuntary dismissal under *R.* 4:37–2(b) is still the standard to be followed. *See Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 535–36, 666 *A.*2d 146 (1995); *Lanzet v. Greenberg,* 126 *N.J.* 168, 174, 594 *A.*2d 1309 (1991); *Evers v. Dollinger,* 95 *N.J.* 399, 402, 471 *A.*2d 405 (1984). This

standard is the same for jury and nonjury trials. *See Lyons v. Hartford Ins. Group,* 125 *N.J.Super.* 239, 243, 310 *A.*2d 485 (App.Div.1973), *certif. denied,* 64 *N.J.* 322, 315 *A.*2d 411 (1974).

■ Further, when the trial court's dismissal is dependent upon its acceptance of the credibility of a key witness, such as Gedicke, the dismissal is sustainable only where the witness's testimony "is clear and convincing, not incredible in the light of general knowledge and common experience, not extraordinary, not contradicted in any way by witnesses or circumstances, and so plain and complete that disbelief of the story could not reasonably arise in the rational process of an ordinarily intelligent mind. . . ." *Ferdinand v. Agricultural Ins. Co.,* 22 *N.J.* 482, 494, 126 *A.*2d 323 (1956). *See also Caliguire v. City of Union City,* 104 *N.J.Super.* 210, 217–19, 249 *A.*2d 603 (App.Div.1967), *aff'd o.b.,* 53 *N.J.* 182, 249 *A.*2d 577 (1969); Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 4:37–2 (1997).

In light of the foregoing standard, we are thoroughly convinced that Cameco's proofs as to liability and damages and the legitimate inferences from them presented a *prima facie* case against Gedicke, Newton, and Mueller based on the theory of breach of the duty of loyalty. The trial court's decision in this regard was based on the acceptance of Gedicke's testimony, which was not so clear and convincing that it satisfied the standard set forth in *Ferdinand v. Agricultural Ins. Co., supra,* and *Caliguire v. City of Union City, supra.* Thus, the trial court erred in making determinations as to Gedicke's credibility and weighing the evidence rather than performing its mechanical judicial function on a motion of this kind. Consequently, the judgment cannot stand with respect to Cameco's claim based on the theory of breach of the duty of loyalty.

■ "An employee owes a duty of loyalty to the employer and must not, while employed, act contrary to the employer's interest. *Auxton Computer Enterprises, Inc. v. Parker,* 174 *N.J.Super.* 418, 425, 416 *A.*2d 952 (App.Div.1980). During the period of employment, the employee has a duty not to compete with the employer's

business." *Chernow v. Reyes,* 239 *N.J.Super.* 201, 204, 570 *A.*2d 1282 (App.Div.), *certif. denied,* 122 *N.J.* 184, 584 *A.*2d 245 (1990). *See also Marchitto v. Central R.R.,* 9 *N.J.* 456, 466, 88 *A.*2d 851 (1952), *overruled on other grounds, Donnelly v. United Fruit Co.,* 40 *N.J.* 61, 190 *A.*2d 825 (1963).

"It is the nature and character of the act performed that will determine if there has been an actionable wrong and whether or not the act has caused some particular injury to the employer." *Auxton Computer Enters., Inc. v. Parker, supra,* 174 *N.J.Super.* at 424, 416 *A.*2d 952. "Obviously, each case must be decided upon its own facts; because of the competing interests the actionable wrong is a matter of degree." *Ibid.*

■ Gedicke plainly owed Cameco a duty of loyalty which included the duty not to compete with Cameco's business. Solicitation of an employer's customers or potential customers, and "other similar acts · in direct competition with the employer's business" constitute a breach of the employee's duty of loyalty. *Id.* at 423–24, 416 *A.*2d 952. *See also Chernow v. Reyes, supra,* 239 *N.J.Super.* at 204–05, 570 *A.*2d 1282 (engagement in competitive enterprise and transacting business with employer's potential customers are actionable conduct).

■ Although Gedicke was not directly competing with Cameco, the duty of loyalty may be breached by actions which do not rise to the level of actual direct competition. As noted, the standard is whether the employee acted contrary to the employer's interest, *Chernow v. Reyes, supra,* 239 *N.J.Super.* at 204, 570 *A.*2d 1282, and the standard's test employs an analysis of the "nature and the character of the" employee's act, *Auxton Computer Enters., Inc. v. Parker, supra,* 174 *N.J.Super.* at 424, 416 *A.*2d 952. In this regard "[c]ourts have recognized the damage a former disloyal employee is able to inflict on his employer, even in the absence of a covenant, where he has launched or assisted a competing business while he is employed." *Platinum Management, Inc. v. Dahms,* 285 *N.J.Super.* 274, 303, 666 *A.*2d 1028 (Law Div.1995) (citing *United Board & Carton Corp. v. Britting,* 63 *N.J.Super.*

517, 527, 164 *A*.2d 824 (Ch.Div.1959), *aff'd*, 61 *N.J.Super.* 340, 160 *A*.2d 660 (App.Div.), *certif. denied*, 33 *N.J.* 326, 164 *A*.2d 379 (1960)).

The *Restatement (Second) of Agency* also supports the proposition that mere assistance or action for a party with a conflicting interest constitutes a breach of loyalty. "Unless otherwise agreed, an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed." *Restatement (Second) of Agency* § 394 (1957). "[T]he agent commits a breach of duty to his principal by acting for another in an undertaking which has a substantial tendency to cause him to disregard his duty to serve his principal with only his principal's purposes in mind." *Restatement (Second) of Agency* § 394 comment a (1957). The breach includes an agent acting for another, but on the agent's own time. *Ibid.*

Clearly, Gedicke acted for at least two of Cameco's competitors, Atalanta Corporation and Kohler Delicatessen Meats, so far as he arranged the shipping of their products. Therefore, under the "mere assistance" analysis, Gedicke was assisting Cameco's competitors in their competition against Cameco, thereby acting contrary to Cameco's interests. The nature and the character of Gedicke's actions, at least as to his assistance of Cameco's competitors, were sufficient to establish a *prima facie* case against Gedicke, his wife, and their company based on the theory of breach of the duty of loyalty.

Furthermore, Cameco had an interest in having its goods delivered on time, that is, according to the demands of its customers. Although the proofs were not entirely clear, Gedicke did arrange for some competitors' goods to be delivered before Cameco's goods. Whether Cameco's goods were simply being delivered second or whether they were being delivered second and untimely, that is, not according to the demands of its customers, is also not entirely clear. However, if Cameco's goods were not being delivered timely to its customer because its competitors' goods were

being delivered first, Cameco has a cause of action for breach of the duty of loyalty. Thus, the nature and character of Gedicke's actions in this regard would indicate that they were against Cameco's interests, thereby establishing a *prima facie* case of disloyalty.

■ In sum, we are satisfied that the trial court failed to apply the correct standard under *R.* 4:37–2(b) in granting the motion for a judgment of involuntary dismissal. Instead, the trial court improperly weighed the evidence and made determinations as to the credibility of the witnesses in reaching the decision that Gedicke did not breach his duty of loyalty. We, therefore, reverse the judgment and remand the matter for a new trial.

We direct that on retrial, the matter be assigned to a different trial judge. *R.* 1:12–1, in pertinent part, provides: "The judge of any court shall be disqualified on the court's own motion and shall not sit in any matter, if the judge ... (d) has given an opinion upon a matter in question in the action[.]" "[A] matter remanded after appeal for a new trial should be assigned to a different trial judge if the first judge had during the original trial expressed conclusions regarding witness credibility. The rule does not, however, apply to opinions expressed by the judge on the issues before him in earlier proceedings in the controversy." Pressler, *Current N.J. Court Rules,* comment 4 on *R.* 1:12–1 (1997) (citations omitted). *See also In Re Guardianship of R.G. & F.,* 155 *N.J.Super.* 186, 195–96, 382 A.2d 654 (App.Div.1977) (holding that the trial judge in a guardianship case should be disqualified after granting a dismissal because he had prematurely weighed the evidence and rendered credibility determinations). Here, the trial court found that Gedicke was a credible witness, but that Mr. Perl was not a credible witness. Since the trial judge had made a credibility finding with respect to these key witnesses, and appeared to have weighed the evidence in granting the judgment of involuntary dismissal in favor of Gedicke, Mueller, and Newton, the retrial must be before a different trial judge.

However, while we reverse the judgment insofar as it dismissed Cameco's claim based on the theory of breach of the duty of loyalty because the trial court failed to apply the correct standard under *R.* 4:37–2(b), we are satisfied that Cameco's proofs were not sufficient to establish a *prima facie* case against Gedicke, Newton, and Mueller based on theories of conversion and unjust enrichment. Cameco does not challenge the dismissal of its claim based on tortious interference with contractual rights and economic advantage.

Plaintiff claims that Gedicke is liable for conversion because he used "Cameco's confidential business information for his own benefit without Cameco's knowledge or approval." "To constitute an act of conversion, '[i]t is sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized dominion and control over it. It is the effect of the act which constitutes the conversion.'" *Charles Bloom & Co. v. Echo Jewelers,* 279 *N.J.Super.* 372, 381, 652 *A.*2d 1238 (App.Div. 1995) (quoting *McGlynn v. Schultz,* 90 *N.J.Super.* 505, 526, 218 *A.*2d 408 (App.Div.1966) (quoting 89 *C.J.S.* § 7 at pp. 536–37), *aff'd,* 95 *N.J.Super.* 412, 231 *A.*2d 386 (App.Div.), *certif. denied,* 50 *N.J.* 409, 235 *A.*2d 901 (1967)) (alteration in original).

Cameco fails to cite any support for the proposition that anything other than tangible personal property, or tangible evidence of title to intangible or real property is subject to conversion so that a cause of action may lie. *See* 89 *C.J.S. Trover & Conversion* § 11 (1955). Moreover, the information in question was not the equivalent of customer lists or other proprietary information. Even if Cameco's shipping information was property subject to conversion, Cameco was not deprived of this property by Gedicke's use of it. In this sense, Gedicke's use of Cameco's information did not have any effect on Cameco. Therefore, the trial court properly granted judgment in favor of Gedicke, Newton, and Mueller with respect to its conversion claim.

With respect to the unjust enrichment claim, Cameco alleges that it proved that Gedicke, Newton, and Mueller "received profits stemming from the operation of [Newton] which was a business conducted in violation of Gedicke's duty of loyalty or, at a minimum, was an enterprise operated out of Gedicke's facility."

> To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust. The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.
>
> [*VRG Corp. v. GKN Realty Corp.*, 135 *N.J.* 539, 554, 641 *A.*2d 519 (1994) (citations omitted).]

Gedicke correctly pointed out that "Cameco conferred no benefit upon Gedicke and Newton, for which Cameco reasonably could have expected compensation." At the time that Cameco exposed Gedicke to its shipping information, Cameco did not expect any remuneration for that "benefit." Moreover, it is not clear that it would be unjust for Gedicke to retain the benefits (profits of Newton) of the benefit (shipping information) he "received" from Cameco, at least as to his customers who were not competitors of Cameco. *See Hirsch v. Travelers Ins. Co.*, 134 *N.J.Super.* 466, 470, 341 *A.*2d 691 (App.Div.1975). Therefore, Cameco does not have a cause of action for unjust enrichment.

Furthermore, the *Restatement (Second) of Agency* § 404A (1957) does not aid Cameco because the shipping information itself did not directly enrich Gedicke. Gedicke may have been enriched (indirectly) from his use of the shipping information, but this enrichment is not unjust because it did not result in any loss or harm to Cameco. *Cf. Restatement (Second) of Agency* § 404A illustrations 1, 2 (1957).

Accordingly, the judgment under review that dismissed Cameco's claims based on theories of conversion and unjust enrichment are affirmed. The judgment, to the extent it dismissed Cameco's claims based on the theory of the duty of loyalty, is reversed and the matter remanded for a new trial limited to the claims based on

that theory before a different trial judge. We do not retain jurisdiction.