724 A.2d 783

CAMECO, INC., PLAINTIFF–RESPONDENT, v. DONALD GED-ICKE, INDIVIDUALLY AND D/B/A NEWTON TRANSPORT SERVICE, NEWTON TRANSPORT SERVICE AND PRISCILLA MUELLER, DEFENDANTS–APPELLANTS.

Argued September 14, 1998—Decided February 18, 1999.

*James F. Keegan,* argued the cause for appellants (*Bendit Weinstock,* attorney; *Mr. Keegan* and *Sherri Davis Fowler,* on the briefs).

*Robert P. Donovan,* argued the cause for respondent (*Fox & Fox,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the liability of an employee for a breach of the duty of loyalty owed to his employer. The primary issue is whether the employer may prove a *prima facie* case for an employee's breach of that duty by proving, not that the employee directly competed with the employer, but that the employee merely assisted the employer's competitor.

At the close of plaintiff's case, the Law Division dismissed the complaint, which asserted various claims in addition to the one alleging the employee's breach of his duty of loyalty. The Appellate Division affirmed the dismissal, except for the claims relating to the breach of the duty of loyalty. *Cameco v. Gedicke*, 299 *N.J.Super.* 203, 690 *A.*2d 1051 (App.Div.1997). We granted Gedicke's petition for certification, 151 *N.J.* 471, 700 *A.*2d 883 (1997), and now affirm.

I.

This appeal arises from the dismissal of the complaint at the conclusion of plaintiff's case in a civil action tried by the court without a jury. In a non-jury action, the court, whether deciding the matter on a motion at the close of the plaintiff's case or the entire case, should support its decision with adequate findings of fact. *R.* 1:7–4; Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 1:7–4 (1998). A dismissal at the close of a plaintiff's case invokes more searching appellate review than does one at the close of the entire case. When reviewing a dismissal at the close of a plaintiff's case, the appellate court accepts the truth of the plaintiff's evidence together with the legitimate inferences that the evidence supports. *R.* 4:37–2(b); *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969). By comparison, when reviewing factual findings made at the close of the entire case, the appellate court accepts those findings whether they support a decision in favor of the plaintiff or the defendant, if the findings are supported by substantial credible evidence. *R.* 2:10–1; *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495

(1974); Pressler, *supra,* comment 2.3 on *R.* 2:10–1. Thus, a dismissal under *Rule* 4:37–2(b) requires a more generous view of a plaintiff's evidence than does one at the close of evidence under *Rule* 2:10–1.

In the present case, when dismissing the complaint, the trial court made only general factual findings. Because the dismissal occurred at the close of plaintiff's case, it invites a careful review of those findings. We reach this conclusion notwithstanding the fact that on plaintiff's case the trial court heard from the critical witnesses: Jerry Perl, president of plaintiff, Cameco, Inc. ("Cameco"); Scott Maier, a certified public accountant whom Cameco retained as an expert witness; and defendants Donald Gedicke and his wife, Priscilla Mueller. Accepting the truth of plaintiff's evidence and according it the benefit of all favorable inferences, the record supports the following factual findings.

Cameco employed Gedicke as a salaried traffic manager to arrange for the transportation of Cameco's food products, primarily tuna, ham, and poultry. Unknown to Cameco, Gedicke and Mueller formed Newton Transport Service ("Newton"), through which they arranged for the transportation of goods for various companies, including two of Cameco's competitors.

In 1993, Cameco fired Gedicke for poor performance. To obtain the money he had paid into Cameco's pension fund, Gedicke signed an agreement not to compete with Cameco. Thereafter, when Cameco learned of Gedicke's activities with Newton, Cameco charged Gedicke with conversion, unjust enrichment, tortious interference with contractual rights and economic advantage, and breach of Gedicke's duty of loyalty as an employee.

As Cameco's traffic manager from March 1984 to January 1993, Gedicke was an employee at-will with a salary of approximately $38,000 per year. Gedicke's primary duty was arranging transportation of Cameco's food products to retail stores by common carrier. His duties included coordinating Cameco's shipping schedules, negotiating the lowest possible shipping rates, and supervising the warehouse employees who loaded the trucks.

Cameco's shipping costs comprised fifteen to twenty percent of its operating expenses. Gedicke's duties also included inspecting Cameco's off-site warehouses for cleanliness and temperature maintenance. Because of his position, Gedicke became familiar with the identity of Cameco's suppliers, customers, and common carriers, as well as its delivery routes and rates, all of which Cameco considers to be confidential information.

In 1990, without telling Cameco, Gedicke and Mueller formed Newton, which they operated primarily from their home. Acting on behalf of distributors or truckers, Gedicke arranged for the transportation of food products to retailers. Typically, the shipper would pay Newton, which, after deducting its commission, would pay the trucker. Newton's net profits increased from $2536 in 1990 to $11,733 in 1992. In 1993, the year in which Cameco fired Gedicke, Newton earned $62,090 in net profits.

Sometimes, Newton acted for a particular trucker when communicating with distributors. On some of these occasions, the distributors paid the truckers directly. The truckers then paid Newton's commissions. Two of the distributors for which Newton arranged transportation, Atalanta Corporation ("Atalanta") and Kohler Delicatessen Meats, Inc. ("Kohler"), sold the same products as Cameco. The record is unclear, and the trial court did not make any findings, regarding the extent to which Gedicke, through Newton, assisted Atalanta or Kohler.

On over six hundred occasions, Gedicke arranged for a trucker transporting Cameco's goods also to transport goods for Newton's customers. Sometimes, the trucker would deliver goods to the same destination for both Cameco and the other distributors. Gedicke explained that "commingled" shipping is routine and that, even after the termination of his employment, goods brokered by Newton continued to be commingled with Cameco's goods. According to Gedicke, the addition of Newton's freight enabled him to negotiate lower rates for Cameco. In such situations, Cameco did not pay the per-pound, less-than-truckload rate or the full-truckload rate. By sharing space and costs with Newton's cus-

tomers, Cameco paid a rate even lower than that for a full truckload. Thus, Cameco benefited from the commingling of goods.

Cameco claimed that occasionally when the same trucker was transporting both shipments, Gedicke would arrange for goods brokered by Newton to be delivered before Cameco's goods. Gedicke explained that because of the truck routes and the destination of the deliveries, this arrangement was practical and did not prejudice Cameco. Cameco also claimed that sometimes truckers would pick up Cameco's goods before picking up Newton's, thereby creating the risk that Newton's customers, some of whom competed with Cameco, would discover Cameco's product information.

When acting for Newton, Gedicke used the general knowledge he had acquired while working for Cameco and for prior employers. Although Mueller was primarily responsible for conducting Newton's business, she relied on Gedicke's superior knowledge. The trial court found that Mueller conducted most of Newton's business from home, and that Gedicke participated primarily during evenings and on weekends.

Gedicke acknowledged that he engaged in telephone conversations relating to Newton's business during his scheduled hours with Cameco. Because Gedicke used his personal credit card in making telephone calls for Newton, Cameco did not pay the toll charges. From day to day, the time that Gedicke spent on placing calls varied. An analysis produced by Gedicke, however, showed that he spent an average of 13.8 minutes per workday on these calls. Although Gedicke acknowledged receiving incoming calls, no record of the incoming calls was available. Occasionally, while truckers were on Cameco's premises, Gedicke would discuss Newton's business with them. The trial court concluded that Gedicke diverted no more than fifteen minutes per day to Newton's affairs.

In January 1993, Cameco became dissatisfied with Gedicke's job performance. Previously, Perl had reprimanded Gedicke for his failure regularly to inspect Cameco's off-site warehouses. Accord-

ing to Perl, he fired Gedicke for failing to conduct such inspections, failing to negotiate lower freight rates, and permitting excessive overtime in his department. Gedicke rejoined that the time he spent on Newton's business did not interfere with the discharge of his duties to Cameco. Additionally, Gedicke testified that he often worked overtime during evenings and weekends for no additional compensation.

The parties' testimony conflicted on several other issues, such as the significance of a rate reduction offered by truckers after Gedicke's termination. Perl claimed that the reduction showed generally that Gedicke had not negotiated the lowest possible rates for Cameco. According to Perl, the rate reduction demonstrated that Gedicke had not been securing the discount that Perl wanted whenever Cameco paid a full-truckload rate for a commingled shipment. Perl also claimed that the reduction demonstrated that Cameco had been paying for excess shipping capacity that Gedicke used for Newton's customers. Gedicke countered that the rate changes stemmed not from his involvement with Newton, but from market changes.

The parties also disagreed over the non-competition agreement that Perl required Gedicke to sign as a condition for receiving his pension funds after his discharge. Perl said the requirement was routine. The trial court, however, inferred from Cameco's failure to enforce the agreement that Newton never had competed with Cameco.

In dismissing the complaint, the trial court found that Gedicke's testimony was credible and that Perl's testimony was "exaggerated" and motivated by "vindictiveness." The court concluded that Gedicke had not breached his duty of loyalty, that he had not acted for anyone whose interests conflicted with those of Cameco, that Gedicke's actions were not detrimental to Cameco, that Newton had not competed directly with Cameco, and that Cameco had not suffered any damages.

Cameco appealed the dismissal of all claims except those asserting tortious interference with contractual rights and economic

advantage. The Appellate Division affirmed the dismissal of Cameco's claims for conversion and unjust enrichment, but reversed and remanded for a new trial on the claim of breach of the duty of loyalty. *Cameco, supra,* 299 *N.J.Super.* at 218–19, 690 *A.*2d 1051. It concluded that the trial court had erred in assessing the credibility of the witnesses and in weighing the evidence before ruling on defendants' motion for an involuntary dismissal. Instead, the trial court should have viewed the evidence in the light most favorable to Cameco and given Cameco the benefit of all inferences. *Id.* at 213, 690 *A.*2d 1051. According to the Appellate Division, Cameco had established a *prima facie* case of a breach of Gedicke's duty of loyalty to Cameco. *Ibid.* The Appellate Division held that the duty of loyalty may be breached by an employee whose actions do not rise to the level of "direct competition" with his employer; "mere assistance" to a competitor of the employer is enough if the employee's actions are contrary to his or her employer's interests. *Id.* at 213–14, 690 *A.*2d 1051.

Certain undisputed facts help to shape the legal analysis. Gedicke was not an officer, director, or shareholder of Cameco. Nor had Cameco, before dismissing Gedicke, required him to sign a covenant not to compete. Cameco, moreover, does not contend that Newton was a direct competitor. Cameco was not in the business of brokering shipments, and Newton was not a food distributor. Gedicke, however, was less than candid with Cameco. He never disclosed to Cameco that he was operating Newton or that he was conducting Newton's business on Cameco's premises during his regular work hours.

The case is not one in which an employee, while employed by one employer, advanced his interests by seeking other employment. Nor is it one in which the employee surreptitiously tried to capture the employer's business, disparage its products, or divert its business to another. Rather, the case is one in which a salaried employee, while working for his employer, supplemented his income by establishing a business that, although it did not compete directly with his employer, may have assisted certain of

the employer's competitors. Hence, the question focuses on the level of assistance to a competitor that would justify a finding that an employee breached the duty of loyalty owed to his or her employer.

The trial court found that Cameco had not suffered any damage. Without explanation, the Appellate Division concluded that Cameco had presented a *prima facie* case on damages. *Id.* at 213, 690 *A.2d* 1051. It made this determination despite the fact that Cameco had not proved any specific compensatory damages such as lost sales, potential sales, profits, or customers. *Id.* at 218, 690 *A.2d* 1051.

## II.

Having heard from Gedicke and Mueller, as well as from Cameco's president and accountant, the trial court proceeded at the conclusion of Cameco's case to assess the credibility of the witnesses. We need not question the accuracy of that assessment to conclude that it should have been deferred until after the close of the evidence.

As previously indicated, on a motion to dismiss at the close of a plaintiff's case, a trial court generally should accept the truth of the plaintiff's evidence and accord the plaintiff the benefit of all favorable inferences that the evidence supports. *Caliguire v. City of Union City,* 104 *N.J.Super.* 210, 219, 249 *A.2d* 603 (App.Div.1967), *aff'd sub nom. In re Estate of Caliguire,* 53 *N.J.* 182, 249 *A.2d* 577 (1969). Assessment of the credibility of witnesses ordinarily awaits the close of the entire case. When dismissing at the close of a plaintiff's case, a trial court should accept the credibility of witnesses only when their testimony is so persuasive that no reasonable person could disbelieve it. *Id.* at 217, 249 *A.2d* 603 (quoting *Ferdinand v. Agricultural Ins. Co.,* 22 *N.J.* 482, 494, 126 *A.2d* 323 (1956)); Pressler, *supra,* comment 2 on *R.* 4:37–2.

To some extent, the trial court's shortcut in assessing credibility at the close of plaintiff's case is understandable; the

court had heard from the principal witnesses. Cameco nonetheless asserts that, although it presented Gedicke and Mueller on its own case as hostile witnesses, it was unable to cross-examine them. Gedicke and Mueller answer that they would not have testified further on their own behalf. Still, Gedicke and Mueller never rested their case. The record does not reveal whether the trial court explored these issues with the parties. In sum, we do not have sufficient confidence in the state of the record to endorse the trial court's assessment of the credibility of the witnesses at the close of Cameco's case.

### III.

The procedural posture of the appeal and the absence of more complete factual findings prevent a definitive analysis of the dispositive rules of law. *See Simulation Sys. Tech., Inc. v. Oldham,* 269 *N.J.Super.* 107, 634 *A.*2d 1034 (App.Div.1993) (reflecting need for adequate proof to support determination of measure of damages). Also hampering the legal analysis is the fact-sensitive nature of cases involving an alleged breach of the duty of loyalty by employees. *Auxton Computer Enter. v. Parker,* 174 *N.J.Super.* 418, 424, 416 *A.*2d 952 (App.Div.1980). The contexts giving rise to claims of employee disloyalty are so varied that they preclude the mechanical application of abstract rules of law. In general, the adjudication of such claims summons rules of reason and fairness. Notwithstanding the need for flexibility when evaluating claims of employee disloyalty, certain principles emerge. *See Restatement (Second) of Agency* § 391 (1958); *see also id.* § 391 comments b, c; *id.* § 393; *id.* § 393 comments b, c, d.

The scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks. Assisting an employer's competitor can constitute a breach of the employee's duty of loyalty. *Id.* § 394 comment a. Similarly, an employee's self-dealing may breach that duty. *Id.* §§ 387, 393.

A reality of contemporary life is that many families will consist of two wage earners, one wage earner with two jobs, or both. For some employees, particularly those earning low or modest incomes, second sources of income are an economic necessity. For them, a second job or "moonlighting" is the only way to make ends meet. Conversely, employers need the assurance that employees will not disserve them by furthering their own interests or those of competitors at the employers' expense.

To avoid the possibility of charges of disloyalty, employees generally should inform employers of their plans before establishing an independent business that might conflict with that of the employer. To an employee, the possibility of conflict with the employer's interest may seem remote; to the employer, the possibility may seem more immediate. The greater the possibility that another occupation will conflict with the employee's duties to the employer, the greater the need for the employee to alert the employer to that possibility.

The egregiousness of the employee's conduct may affect the determination of both the commission of a breach and the appropriate remedy. Whether an employee who has not obtained the employer's consent may engage in conduct that assists a competitor depends on the facts of each case. *Auxton, supra,* 174 *N.J.Super.* at 424, 416 *A.*2d 952. In some cases, the assistance may be so unintended or inconsequential that it will not result in a breach of the employee's duty of loyalty. *See, e.g., id.* at 425, 416 *A.*2d 952. In other cases, the assistance may be so substantial that the employee will be liable for a breach of that duty. *See, e.g., Platinum Management, Inc. v. Dahms,* 285 *N.J.Super.* 274, 303–05, 666 *A.*2d 1028 (Law Div.1995). Thus, slight assistance to a direct competitor could constitute a breach of the employee's duty of loyalty. When competition is indirect or minimal, however, the employer, to establish a breach, may be required to show that the employee rendered substantial assistance to the competitor. Employees also may breach their duty of loyalty by aiding an adverse party engaged in a transaction with

their employer, *Restatement (Second) of Agency, supra,* § 391, or by aiding one whose interests conflict with those of their employer, *id.* § 394; *see also id.* § 394 comment b ("It is much easier to find that an agent is privileged to act for a competitor than to find that an agent is privileged to act for an adverse party.").

Depending on the facts of the case, an employee's breach of the duty of loyalty can give rise to either equitable or legal relief. *See United Bd. & Carton Corp. v. Britting,* 63 *N.J.Super.* 517, 164 *A.*2d 824 (Ch.Div.1959), *aff'd,* 61 *N.J.Super.* 340, 160 *A.*2d 660 (App.Div.), *certif. denied,* 33 *N.J.* 326, 164 *A.*2d 379 (1960) (awarding equitable relief instead of damages). Cameco does not demand such equitable relief as an injunction or accounting, but does seek disgorgement of Newton's profits and forfeiture of Gedicke's salary. It also requests compensatory money damages.

In an appropriate case, damages may include profits the employee earned in another enterprise while still employed, *see Chernow v. Reyes,* 239 *N.J.Super.* 201, 205, 570 *A.*2d 1282 (App.Div.), *certif. denied,* 122 *N.J.* 184, 584 *A.*2d 245 (1990), and compensation for a direct injury suffered by the employer as a result of the employee's breach, *see United Bd. & Carton, supra,* 63 *N.J.Super.* at 532–33, 164 *A.*2d 824. Thus, the *Restatement (Second) of Agency* states generally that "[a]n agent is subject to liability for loss caused to the principal by any breach of duty." *Restatement (Second) of Agency, supra,* § 401. If the employee usurped a corporate opportunity or secretly profited from a competitive activity, the employer may recover the value of the lost opportunity or the secret profit.

Generally, to recover money damages, the employer must establish that the employee's breach proximately caused the requested damages. In the present case, even under the generous standard applicable on a motion to dismiss under *Rule* 4:37–2(b), the record does not establish that Gedicke's alleged breach caused Cameco to suffer any money damages.

Finally, in addition to more traditional damages, an employer may seek forfeiture of its employee's compensation. As with other aspects of breach-of-duty cases, the facts color an employer's right to recoup compensation.

In *Joseph Toker, Inc. v. Cohen*, 67 *N.J.Super.* 68, 169 *A.*2d 838 (App.Div.1961), a fuel oil distributor sought to recover money paid to its former manager, who had received a salary plus a monthly draw as an advance payment of a percentage of profits. After leaving his employment, the employee established a competing company. The employer claimed part of the advances it had paid to him. In rejecting the employer's claim, the Appellate Division concluded that the advances constituted a guaranteed minimum that the employee need not return. *Id.* at 77–78, 169 *A.*2d 838. The Appellate Division affirmed the trial court's finding that the employee had not breached his duty of loyalty and added: "In the absence of fraud, duress, mistake, or express or implied agreement to the contrary, a voluntary payment of wages may not be recovered from an employee, even though the latter's conduct subsequent to receipt of the payments would have disentitled him to receive them." *Id.* at 81, 169 *A.*2d 838.

Recently, the Appellate Division revisited the issue of an employer's right to recover compensation paid to a disloyal employee. *Simulation Sys., supra,* 269 *N.J.Super.* 107, 634 *A.*2d 1034. In *Simulation Systems,* the employee, a computer engineer, formed a company and for eleven months sold computer-related services in direct competition with his employer. The Chancery Division awarded the employer the employee's profits of $1711, but denied recovery of the compensation that had been paid to the employee. In affirming, the Appellate Division reasoned that the employer could recover the compensation it had paid during periods in which the employee had been disloyal. *Id.* at 111–12, 634 *A.*2d 1034. The court denied recovery, however, because the evidence failed to establish the pay periods in which disloyalty had occurred or the compensation paid for those periods.

Illinois and New York courts, in contrast, impose forfeiture on all compensation paid or owing an employee during a period of disloyalty. They do not permit set-off even for properly performed services in such a period. *See, e.g., ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.,* 90 *Ill.App.*3d 817, 46 *Ill.Dec.* 186, 413 *N.E.*2d 1299, 1315 (1980); *Maritime Fish Prods., Inc. v. World Wide Fish Prods., Inc.,* 100 *A.D.*2d 81, 474 *N.Y.S.2d* 281, 285, 287 (1984).

Massachusetts courts have limited the employer's right of recovery to that part of compensation paid during disloyalty that exceeds the employee's value to the employer. For example, the Supreme Judicial Court of Massachusetts refused to require a disloyal employee to forfeit over seventy-five percent of his compensation when the disloyal conduct was a "practically harmless" act, and the employee's services otherwise were "wholly faithful and outstandingly successful." *Walsh v. Atlantic Research Assocs.,* 321 *Mass.* 57, 71 *N.E.*2d 580, 585 (1947).

In the *Restatement (Second) of Agency,* the American Law Institute has provided guidelines to govern employers' claims for damages. Section 469 states the general rule that "[a]n agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty." The supporting rationale is that the compensation is part of the profit for which the disloyal employee must account. *Henderson v. Rep Tech, Inc.,* 162 *A.D.*2d 1028, 557 *N.Y.S.2d* 224, 225 (1990). Under the *Restatement,* an employer may recover compensation paid to a periodically paid employee for any periods during which the employee committed acts of disloyalty. *Simulation Sys., supra,* 269 *N.J.Super.* at 111–12, 634 *A.*2d 1034. Although the American Law Institute is drafting a new *Restatement of Agency,* it has not yet addressed the issue of an employer's right to recover compensation paid to a disloyal employee.

According to the current *Restatement,* when the employee's conduct is "willful and deliberate" or "serious," the employee may not set off the value of his or her services against the employer's

claim to recoup compensation paid to the employee. *Restatement (Second) of Agency, supra,* § 469; *id.* § 469 comment b. Thus, the egregiousness of the employee's conduct may affect the employer's right to withhold or recoup the employee's compensation. If the employee directly competes with the employer, aids the employer's direct competitors or those with interests adverse to the employer's interests, participates in a plan to destroy the employer's business, or secretly deprives the employer of an economic opportunity, the employee may forfeit the right to compensation. *See, e.g., Orkin Exterminating Co. v. Rathje,* 72 *F.*3d 206, 209–10 (1st Cir.1995); *Luskin v. Seoane,* 226 *A.D.*2d 1144, 641 *N.Y.S.2d* 478, 479 (1996); *Bon Temps Agency v. Greenfield,* 184 *A.D.*2d 280, 584 *N.Y.S.2d* 824, 825–26 (1992); *Maritime Fish Prods., Inc., supra,* 474 *N.Y.S.2d* at 285–87. In contrast, if the employee's breach is minor, involves only a minimal amount of time, or does not harm the employer, the employee may be entitled to all or substantially all of his or her compensation.

In sum, various considerations affect determination of the breach of an employee's duty of loyalty and the appropriate remedy for a breach, including forfeiture of the employee's compensation. One consideration is the possible existence of contractual provisions. A provision might permit an employee to seek a second source of income, whether through a second job or an independent business. Conversely, a non-competition covenant might limit an employee's economic activities both during and after employment. A second consideration is whether the employer knew of or agreed to its employee's secondary profit-seeking activities. An employee's disclosure of an intention to pursue a second source of income alerts the employer to potential problems and protects the employee from a charge of disloyalty. The third consideration concerns the status of the employee and his or her relationship to the employer. An officer, director, or key executive, for example, has a higher duty than an employee working on a production line. Fourth, the nature of the employee's second source of income and its effect on the employer are relevant. An

employee's duty of loyalty to an employer generally precludes acts of direct competition. Employees should not engage in conduct that causes their employers to lose customers, sales, or potential sales. Nor should they take advantage of their employers by engaging in secret self-serving activities, such as accepting kickbacks from suppliers or usurping their employer's corporate opportunities. Employees who defraud their employers or engage in direct competition with them run the risk of discharge, forfeiture of the right to compensation, and other legal and equitable remedies. The extent to which the preceding considerations apply will vary from one case to another. Absent a governing contractual provision, the judicial task is to search for a fair and reasonable solution in light of the relevant considerations.

If, on remand, the trial court concludes that Gedicke breached his duty of loyalty to Cameco, the court must then consider the appropriate remedy. Two forms of relief might be appropriate for such a breach: forfeiture of part of Gedicke's salary or an award of part of Newton's profits. Of the two, forfeiture of part of Gedicke's salary seems more apt. Gedicke did not compete directly with Cameco, aided only marginally two of Cameco's competitors, and did not seek to destroy or injure Cameco's business.

Newton's profits during Gedicke's employment with Cameco were modest. The time that Gedicke spent on Newton's business during work hours with Cameco was minimal. Mueller, who was never employed by Cameco, may have contributed more than Gedicke to Newton's profits. Gedicke, however, spent some time during his workday on Newton's business. Even before learning of Newton's existence, Perl concluded that Gedicke was performing so unsatisfactorily that Perl fired him. One possible outcome is to limit Cameco's recovery to recoupment of part of the salary it paid to Gedicke during pay periods when Gedicke was advancing Newton's interests.

The limited record precludes a more definitive analysis of Cameco's right to recover. Among the facts supporting a recov-

ery are that Gedicke never informed Perl that he had established an independent business as a truck broker; that Gedicke spent some time during his normal work hours engaged in Newton's business; that truck-brokerage put Gedicke in a position where he could assist, perhaps unintentionally, the truckers and Cameco's competitors.

Facts suggesting that Gedicke did not breach his duty of loyalty are that he was a low- or mid-level salaried employee; that during his employment, Gedicke was not subject to any contractual limitation preventing him from establishing an outside business; that he did not cause Cameco to lose any customers, sales, potential sales, or profits; and that he did not compete directly with Cameco or render substantial assistance to any of its competitors.

Viewing Cameco's evidence in the most favorable light, Cameco adduced sufficient evidence to survive Gedicke's motion to dismiss. Sitting as the ultimate fact finder, the trial court, however, might determine that Gedicke's "assistance" to Atalanta and Kohler was so insubstantial or that the competition between them and Cameco was so inconsequential that Gedicke's conduct did not harm Cameco. Similarly, the court could find that Gedicke did not act adversely to Cameco's interests concerning its customers or the truckers.

The judgment of the Appellate Division is affirmed as modified, and the matter is remanded to the Law Division.

*For affirmance as modified and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.