**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4060-16T4

IN THE MATTER OF THE ESTATE
OF MABEL A. MCDERMOTT,
        Deceased.

_____

Argued February 6, 2019 – Decided May 14, 2019

Before Judges Fuentes, Accurso and Moynihan.

On appeal from Superior Court of New Jersey, Chancery Division, Morris County, Docket No. P-001917-13.

Elliott L. Pell argued the cause for appellant Joy McDermott-Guber.

Jennifer L. McInerney argued the cause for respondent Bart Alan McDermott (Torzewski & McInerney, LLC, attorneys; Jennifer L. McInerney on the brief).

PER CURIAM

Plaintiff Joy McDermott-Gruber appeals from the judgment entered by the

trial court, following a five-day bench trial, in favor of her brother, defendant

Bart Alan McDermott (Alan), individually and as executor of the estate of their

mother, Mabel McDermott,[1] and the defendant-estate (collectively: defendants).[2] The court dismissed with prejudice Joy's amended verified complaint in which she advanced claims for unjust enrichment, breach of fiduciary duty and conversion.

Joy argues she is entitled to judgment on each of her three causes of action because: Mabel made two gifts inter vivos to her – the proceeds of the sale of properties in Parsippany and assets in a Charles Schwab portfolio – which were misappropriated by defendants who converted plaintiff's money and property to their unlawful use and benefit; Mabel agreed to manage plaintiff's funds and breached the fiduciary duty arising from that agreement; and Mabel was unjustly enriched by those acts. Joy also argues the trial court erred in dismissing her complaint under the entire controversy doctrine. We determine the trial court's findings of fact and its conclusion that Joy failed to prove any of her three causes of action are supported by sufficient, credible evidence in the record and affirm.

We glean the facts, including pertinent, contextual family history, from the trial court's findings as supported by the trial record. Mabel and her husband,

---

[1] Mabel passed on June 7, 2013.

[2] We use the given names of the McDermott family for clarity; by doing so, we mean no disrespect or familiarity.

A-4060-16T4

Bart McDermott both operated Bart J. McDermott, Inc. (BJM), a company primarily involved in residential real estate development until Bart's death in 1992. Mabel handled "the books," that is, the financial end of the business. Alan was "very much involved" in the business. Joy testified she operated a retail florist shop with her husband during the day but was steadily involved in design work for BJM in the evenings after the florist shop closed and on weekends. Alan countered that Joy was uninvolved with BJM and worked full-time with her husband at the florist shop. The court did not credit Joy's testimony and found she "received money from BJM without working there."

Joy and Alan, through transfers from Mabel and Bart, acquired an interest in a Parsippany property commonly known as 8 Grange Road and in a contiguous vacant tract. Alan, with plans to develop the Parsippany properties, contracted to purchase Joy's share in 8 Grange Road and the vacant tract in September 2004 for $318,055.55; the deeds, dated July 21, 2005, were recorded in August 2005.[3] The trial court found Joy gave the proceeds checks to Mabel.

---

[3] We cannot discern the exact date the deeds were recorded. Consideration on each of the deeds is one dollar.

A-4060-16T4

Plaintiff's expert witness traced the sum paid to Joy for the properties. Based on his testimony, the trial court found those funds were deposited on December 13, 2005 into Bank of America (BOA) money-market account 4286[4] in the names of Mabel, Joy and Alan; interest income from the account was credited to Joy for income-tax purposes. On January 25, 2006, Mabel transferred $318,000 from account 4286 to BOA certificate of deposit (CD) account 8826 held jointly by Mabel, Joy and Alan. Upon maturity of the CD on January 25, 2007, Mabel transferred the balance – $331,781.33 – into BOA checking account 1121 on which Mabel and Joy were signatories.[5] Account 1121 already had a balance, including the proceeds from a property-damage settlement, in excess of $40,000, paid to Mabel from a motor vehicle accident in which she was involved. Mabel withdrew $400,000 from account 1121 on

---

[4] Like the trial court, we use only the last four digits of each account number.

[5] At one point during its oral decision, the trial court stated this account was "in the names of" Joy, Alan and Mabel. The documentary evidence, however, shows that Alan was not included on this account. In the balance of its decision, when the court referenced this account, it mentioned only Mabel's and Joy's activity; it did not mention Alan. In fact, the court found the account was placed in the names of Joy and Mabel in early 2007; Joy identified hers and Mabel's signatures on the signature card for account 1121 and confirmed she signed it "[a]round January 2007" even though her "name was already on the account." We do not perceive that the single reference to Alan in connection with account 1121 had any significance in the ultimate outcome of this case.

February 12, 2007 and deposited the funds into BOA certificate of deposit account 8524 in the name of Joy and Mabel. On April 27, 2010, the sum of $296,055.43 was redeemed from account 8524 and deposited into an individual BOA checking account 4309 in Mabel's name only. Shortly thereafter Alan's name was added to account 4309. On November 18, 2011, Alan transferred $353,472.35 from account 4309 into BOA account 8479, in his name only.

Mabel also withdrew $60,000 from Joy's Charles Schwab account in six $10,000 increments in September and October 2010 and February, April, June and July 2011. The trial court found the account – which had a balance of $736,334.86 in September 2010 – was "a portfolio with various stock holdings and other financial assets which [Joy] funded from the money she derived from her role as a BJM shareholder." The court also found "Joy came to have" "the contents [of the portfolio], including a rather large holding of stock in Exxon Mobil, . . . through Mabel's generosity."

Joy avers she entrusted to Mabel the management of the inter vivos gifts made to her – the proceeds from the sale of the Parsippany properties and the assets in the Charles Schwab account – and that Mabel breached a fiduciary duty owed to Joy resulting in Mabel's unjust enrichment. She also alleges these defendants converted these assets.

A-4060-16T4

The trial court concluded the fatal flaw in all Joy's claims was that she failed to prove the funds taken belonged to her. Finding that "so much of what Joy and Alan had derived was from the generosity of their parents," and that Joy, who "derived little income from her work" at the small retail florist shop, particularly benefitted from "her parents, and especially her mother's generosity," the trial court determined that "Mabel maintained her interest in all of this money . . . and it didn't belong to Joy"; "[t]his was family money."

The court said Joy gave Mabel the proceeds from the sale of the Parsippany property "because she knew that Mabel exercised dominion and control over the family assets and the money derived from the business." The court attributed Joy's testimony that she was unaware that the proceeds were to be deposited in BOA account 1121 to her knowledge "that Mabel exercised dominion and control over the money because its source was derived from assets of the parents." When Joy testified that she wasn't involved in various BOA account transfers, the court said "that's because it was not her money." And the court found the reason Joy testified that she did not know "what was happening with what she called 'her money'" between 2007 and 2010 was that Joy "didn't consider it to be hers. It was, in fact, her mother's money."

Some of the accounts were jointly held and thus, pursuant to N.J.S.A. 17:16I-4(a), "[i]n the absence of proof of net contributions" to the amounts on deposit, the account would normally belong in equal shares to all parties who had a present right of withdrawal. That general rule, however, can be set aside if there is clear and convincing evidence of a different intent at the time the account is created. N.J.S.A. 17:16I-4. The judge found such evidence:

> Joy's contributions were very few. The statute simply doesn't apply in this case because of the nature of the relationship between especially Mabel and Joy, and how the parties treated this rather considerable sum of money with which this family was blessed, and Mabel always had the ability to determine where money would go and how it would be spent.

The trial court explained that the crediting of income from some accounts to Joy for tax purposes was "not surprising because Joy had the benefit of a lot of this money and Mabel, who was paying taxes on other money, simply felt it was fair that Joy should pay her share of some of the taxes from this family money." And the court was unconvinced by evidence presented to support Joy's claim to the accounts:

> [R]eferences to "Joy's account" found in certain exhibits, annotated in Mabel's hand . . . was simply a reference to Joy's taking income on accounts for tax purposes. The same purpose regarding . . . "her CD[.]" This was not a designation of ownership by Mabel of

7

the account or the money there. Mabel . . . controlled the account.

The trial court found Joy did not object to Mabel's withdrawals from the accounts. The court concluded Joy knew of those withdrawals and that she was not credible when she professed not to have knowledge of them. The court credited Alan's testimony that: the account statements went to the Arlington Avenue house where Joy then lived with Mabel;[6] Joy opened all the mail and received the statements; and that only Joy had access to the statements, especially during the time Mabel was too frail to "make her way down to get the mail" from the mailbox at the end of the driveway.

The trial court also found Joy was not credible on a number of other issues, including her testimony about the origin of the Schwab assets and that: she was the sole owner of BOA account 4286; Mabel did not have authority to withdraw funds from the Schwab account; she did not know how much she earned from the florist shop.

We defer to the trial court's factual findings so long as "there is substantial credible evidence in the record to support the findings." Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 397 (2009) (quoting State v. Adams, 194 N.J.

---

[6] Joy's residence as set forth in her amended complaint is the Arlington Avenue address.

186, 203 (2008)). "Appellate courts should defer to trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." State v. Locurto, 157 N.J. 463, 474 (1999). In a non-jury case, we will not disturb the findings upon which the judgment is based unless "they are so wholly unsupportable as to result in a denial of justice . . . ." Rova Farms Resort v. Inv'rs Ins. Co., 65 N.J. 474, 483-484 (1974) (quoting Greenfield v. Dussesault, 60 N.J. Super. 436, 444 (App. Div. 1960)). Ultimately, our role

> is to determine whether the result could reasonably have been reached by the trial judge on the evidence, or whether it is clearly unfair or unjustly distorted by a misconception of law or findings of fact that are contrary to the evidence. The task is a difficult one of balancing the need for a check on unbridled discretion in the trial court against affording a trial de novo in this court.
>
> [Perkins v. Perkins, 159 N.J. Super. 243, 247 (App. Div. 1978).]

Applying those tenets, we determine the trial court's judgment was well-supported by the record.

A claim of conversion requires a showing that "the owner has been deprived of his property by the act of another assuming an unauthorized

A-4060-16T4

dominion and control over it." Cameco, Inc. v. Gedicke, 299 N.J. Super. 203, 217 (App. Div. 1997) (quoting Charles Bloom & Co. v. Echo Jewelers, 279 N.J. Super. 372, 381 (App. Div. 1995)), aff'd as modified, 157 N.J. 504 (1999). "The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 456 (App. Div. 2009). "Therefore, the property allegedly converted 'must have belonged to the injured party.'" Sun Coast Merch. Corp. v. Myron Corp., 393 N.J. Super. 55, 84 (App. Div. 2007) (quoting Commercial Ins. Co. of Newark v. Apgar, 111 N.J. Super. 108, 115 (Law. Div. 1970)).

The trial court rejected Joy's conversion action because it found she never proved the funds taken were hers. The court's finding that the funds were "family money" controlled by Mabel negates key elements of conversion. Mabel exercised dominion and control over that family money as she had authority to do since the time she and Bart ran BJM.

A "fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship," or when "one party places trust and confidence in another who is in a dominant or superior position." F.G. v. MacDonell, 150

N.J. 550, 563 (1997). The proofs support the trial court's conclusion that Joy's claim that a fiduciary relationship was created when she entrusted her monies to Mabel was "not true."

The trial court did not find credible Joy's claim that Mabel agreed to manage her finances and pay her bills from BOA account 1121, which Joy termed a "convenience account." The court found Joy paid many of her bills from Joy's account at Sovereign Bank and "reject[ed] the notion that [Joy] was completely reliant upon Mabel." And the court concluded the funds did not belong to Joy.

That finding also supported the trial court's rejection of Joy's unjust enrichment claim. Joy was required to prove Mabel received a benefit and that retention of that benefit "would be unjust." Assoc. Commercial Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986) (quoting Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 109 (App. Div. 1966)). As the trial court ruled, "[Joy] did not meet those proofs here because the money was Mabel's."

We, therefore, affirm the trial court's judgment for defendants. In light of our decision on the merits, it is unnecessary to determine if the trial court – in finding that this action should have been joined with Joy's quiet title action, commenced in June 2012, which, like this action, was precipitated by a dispute

11

between Joy and Mabel that commenced in November 2011 – properly applied the entire controversy doctrine to preclude Joy's claims.[7]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Joy also advanced in her merits brief that the trial court's application of the entire controversy doctrine deprived her of her right to a jury trial. At oral argument, she, through counsel, conceded that "the parties agreed there wouldn't be a jury trial" when they decided to maintain this action in the Chancery Division.

A-4060-16T4