**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0952-17T3

TECHNOLOGY DYNAMICS, INC.,
d/b/a NOVA BATTERY SYSTEMS,

     Plaintiff-Appellant,

v.

ANWAR MASTER, WALTER
BERINGER, EMERGING POWER,
INC., and TARADAN, INC.,

     Defendants-Respondents,

and

LORRAINE HARA and PNC, INC.,

     Defendants.

_____

Argued February 4, 2019 – Decided February 26, 2019

Before Judges Sabatino and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-4328-16.

Evan L. Goldman argued the cause for appellant (Goldman, Davis & Gutfleish, PC, attorneys; Evan L. Goldman, on the briefs).

Jed L. Marcus argued the cause for respondents Anwar Master and Walter Beringer (Bressler, Amery & Ross, PC, attorneys; Jed L. Marcus, of counsel and on the brief; Ann Marie Effingham, on the brief).

John M. Bradham argued the cause for respondents Emerging Power, Inc. and Taradan, Inc. (Morea Schwartz Bradham Friedman & Brown, LLP, attorneys; Thomas A. Brown, II, on the brief).

PER CURIAM

Plaintiff Technology Dynamics, Inc. ("TDI")[1] appeals a series of Law Division orders that culminated in the dismissal of its lawsuit against two of its former key employees and a competitor that hired them. Among other things, plaintiff mainly contests: (1) the trial court's denial of its unopposed request for a first discovery extension in this complex business litigation; and (2) the court's subsequent grant of summary judgment in favor of defendants on all counts of plaintiff's complaint, which was entered at a time when plaintiff was an unrepresented corporation.

---

[1] TDI does business under the name Nova Battery Systems ("NBS"), a subsidiary. Because the briefs and the record materials at times refer to plaintiff as NBS, we shall do likewise.

2

For the reasons that follow, we reverse in part, reinstate two counts of plaintiff's amended complaint, and remand to reopen discovery on fair terms and conditions to be specified by the trial court after a case management conference.

I.

Because we are remanding for further discovery and proceedings, we need not present here the record definitively, or thoroughly. Instead, we will describe succinctly the facts and procedural history most salient to our disposition. We do so mindful that the parties dispute numerous events within the chronology, and the intentions of various actors.

NBS is a New Jersey company with its principal office in Bergenfield. NBS is in the business of developing and selling battery assemblies and battery chargers in the medical and portable equipment fields. The president and owner of NBS's affiliated company TDI is Aron Levy.

In January 2013, TDI bought the battery assembly business of Ansmann USA Corporation ("Ansmann") and began operating that business as NBS. At the time of the acquisition, defendant Anwar Master was Ansmann's general manager and defendant Walter Beringer worked there as a sales manager. Master and Beringer then became employees of NBS, until their departures that precipitated this lawsuit.

A-0952-17T3

Master and Beringer were at-will employees of NBS. The terms of their service were not embodied in any signed employment contracts. As NBS concedes, Master and Beringer did not have any written or oral agreements not to compete with NBS. Nor did they have any written non-disclosure agreements with NBS, although they did sign such agreements with certain NBS customers.

Both Master and Beringer left NBS in the latter part of 2015. Master resigned in October 2015. Beringer resigned in August 2015, although he continued, at the request of NBS, to service certain customers briefly through mid-September 2015 until his replacement took over.

After leaving NBS, both Master and Beringer promptly began working for defendant Emerging Power, Inc. ("EPI"), a competitor of NBS.[2] As plaintiff alleges, EPI, through the efforts of the individual codefendants, started or expanded its sales to customers of NBS. In essence, plaintiff's theory of this case is that Master and Beringer breached their fiduciary duties to NBS while they were still employed with NBS by allegedly plotting to divert NBS's customers and misuse confidential information, and take that business with them

---

[2] EPI has an affiliated company, Taradan, Inc. ("Taradan"), which is also a codefendant in this case.

A-0952-17T3

to EPI. Plaintiff further maintains EPI conspired with Master and Beringer to accomplish the illicit diversion of business.

Defendants acknowledge that EPI did make sales to certain customers who had previously done business with NBS after Master and Beringer joined EPI. However, they deny that any legal duties were breached or that any wrongful conduct occurred.

In December 2015, NBS filed a multi-count complaint in the Chancery Division against Master, Beringer, EPI, and Taradan. The complaint sets forth the following causes of action: (1) violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-1; (2) civil conspiracy; (3) breach of duty of loyalty; (4) breach of contract; (5) breach of implied covenant of good faith and fair dealing; (6) intentional misrepresentation; (7) negligent misrepresentation; (8) tortious interference with contract; (9) tortious interference with prospective business; (10) conversion; and (11) unjust enrichment. By way of an order to show cause, NBS sought, among other things, an order enjoining Master and Beringer from disclosing any propriety and/or confidential information and an order restraining Master and Beringer from providing services of any kind to EPI.

A-0952-17T3

The defense opposed the order to show cause in the General Equity Part of the Chancery Division. The parties engaged in limited documentary discovery to address the injunctive issues.

On February 25, 2016, the General Equity judge entered a case management order specifying a return date on the order to show cause, various interim discovery deadlines, a discovery end date ("DED") in the General Equity case of October 14, 2016, and a trial date in General Equity of December 20, 2016.

On April 11, 2016, the General Equity judge denied NBS's requests for injunctive relief. At that point, NBS elected to discontinue pursuing restraints, and the case was transferred to the Law Division. The Law Division case was designed as a "Track IV" complex commercial litigation matter.

The sole case management conference in the Law Division took place on September 29, 2016. On that date, the Law Division judge issued a Case Management Order ("CMO") specifying that all interrogatories were to be propounded by October 27, 2016 and answered by November 17, 2016; the deposition of plaintiff's president Levy to be completed by November 1, 2016; and the deposition of defendant's non-party witness in Boston to be completed

A-0952-17T3

by December 1, 2016. The CMO specified a DED of April 15, 2017, which is 450 days from the date that EPI had filed its answer in the Chancery Division.

On February 4, 2017, the Law Division issued a reminder notice to the parties reiterating that discovery would end on April 15, 2017. A few weeks later, on March 6, 2017, the court sent the parties a notice informing them that a trial in the Law Division had been scheduled for September 5, 2017. Notably, this trial notice was issued about a month before the DED.

Meanwhile, the parties encountered difficulties in completing the documentary phase of discovery. Defendants allege that those obstacles were wholly or largely due to the lack of cooperation of NBS and its president, Levy. In any event, no depositions, except for the March 16, 2017 deposition of the third party witness in Boston, occurred until April 21, 2017. On that date, defendants began – but did not complete – the deposition of Levy. No depositions of defendants occurred, and no expert reports were yet exchanged.

On March 28, 2017, NBS moved to extend the DED, asserting that the case had involved extensive paper discovery and complex discovery-related motions, which had hindered the completion of that discovery phase. Plaintiff set forth a proposed plan for extending certain discovery, providing dates for the depositions of the individual defendants and other persons, which counsel had

mutually scheduled in April 2017. NBS further represented that the parties should be able to conclude fact depositions by the end of May 2017, and proposed an extension of the DED, with a corresponding postponement of the September trial date.

Notably, defendants did not file opposition to plaintiff's motion for this first discovery extension. Nonetheless, the trial court denied the requested extension in an order issued on April 13, 2017. Among other things, the order and the court's attached reasons determined that plaintiff had not shown "exceptional circumstances" to warrant the unopposed discovery extension, and that the September 5, 2017 trial date would not be adjourned. The order did indicate that the parties could continue to pursue discovery on a consensual basis, so long as the September trial date was not disturbed.[3]

As we have noted, the deposition of Levy was then partially conducted, with an expectation it would continue at later date. Thereafter, defense counsel advised plaintiff's counsel that, in light of the court's rejection of a discovery extension, defendants would no longer continue engaging voluntarily in the discovery process.

---

[3] For reasons unclear from the record, plaintiff's counsel did not inform defense counsel until after Levy's partial deposition that the court had denied the discovery extension.

Plaintiff moved for reconsideration of the court's rejection of the discovery extension. The court denied that motion as well, again finding no exceptional circumstances.

Thereafter, plaintiff's counsel moved to withdraw from the case, citing an unspecified "potential conflict of interest." The motion requested the court to reschedule the September 2017 trial date in light of counsel's proposed withdrawal.

The court issued an order on July 21, 2017, granting counsel's motion to withdraw, but declined to reschedule the trial date. Notably, the withdrawal order signed by the judge – a marked-up version of the form of order supplied by plaintiff's counsel – contained no provision with a deadline for plaintiff (a corporation prohibited from representing itself under Rule 1:21-1(c)), to secure new counsel to enter an appearance in the litigation.

Defendants, meanwhile, moved for summary judgment dismissing all of plaintiff's claims. They particularly stressed Levy's admission at his deposition that neither Master nor Beringer had entered into any written or oral non-compete agreement or confidentiality agreement with NBS while they worked there.

9

The pendency of the summary judgment motions caused plaintiff's then-former counsel to move to be reinstated into the case. In support of this reinstatement motion, the law firm submitted a certification from Levy, asserting that he had waived the conflict of interest and expressing his desire to have the law firm file opposition to the summary judgment motions. The law firm tendered that opposition, which included certain materials obtained in discovery that were said to reflect the existence of genuine materials of fact.

The trial court denied counsel's motion for reinstatement, noting that the request did not substantiate why the asserted conflict had been eliminated or why it was waivable. The trial court then proceeded to address the summary judgment motions in successive orders dealing, first, with the individual defendants and then, second, EPI. The court treated plaintiff's summary judgment opposition as a "courtesy copy," indicating in its rulings that it had considered the papers nonetheless. Even so, both summary judgment orders issued by the court were stamped "UNOPPOSED."

In written riders to its summary judgment orders, the trial court ruled there were no genuine issues of material fact that could support NBS's assorted causes of action. Among other things, the court underscored there was no evidence of an enforceable agreement among Master, Beringer, and NBS regarding

10

confidentiality, and no agreement preventing the individual defendants from competing with NBS or soliciting its customers. The court specifically noted that certain circuit board designs that Master and Beringer shared with EPI are the property of the customers, and are available on the Internet and are thus not confidential. Additionally, the court found that NBS had produced no evidence substantiating its claims of monetary damages. Accordingly, the court dismissed NBS's complaint with prejudice.

NBS retained new counsel and moved for reconsideration of the summary judgment orders. That attempt to revive the lawsuit failed, and this appeal ensued.

## II.

On appeal, NBS presents a litany of arguments criticizing the trial court's various determinations that culminated in the lawsuit's dismissal with prejudice. These arguments can be divided into two categories: (A) the denial of the unopposed discovery extension; and (B) the grant of summary judgment to all defendants. We address these issues in turn.

## A.

We first consider the discovery issue. A civil case, such as this one, designated as a Track IV complex litigation is to be afforded a minimum

discovery period of 450 days.  R. 4:24-1(a).  In this instance, the DED of April 15, 2017 fixed by the trial court counted the time the parties initially spent litigating injunctive issues in General Equity towards the 450-day allotment.  No party objected to that calculation when the CMO in the Law Division was entered.[4]

The Rules of Court provide mechanisms for discovery to be extended beyond the standard allotments.  One such mechanism is the so-called "automatic initial extension" of Rule 4:24-1(c), which allows an initial discovery period extension of up to sixty days as of right, provided that all parties consent and the request is made by letter to the court before the discovery period has expired.  Here, plaintiff's request to extend discovery was made before the DED. However, because defendants had not affirmatively given their consent to the extension – but also had not opposed it – plaintiff filed a formal motion to obtain that extension pursuant to Rule 4:24-1(c).

A critical facet of a requested discovery extension is the pertinent legal standard to evaluate such requests.  The Rules prescribe that if an arbitration or

---

[4] We do note in passing, however, that it generally should not be presumed that time spent litigating a case in a different Division automatically should be fully counted towards discovery periods in the Law Division.  Cf. Rule 4:24-1(d) (which analogously excludes all days during a temporary removal to federal court towards the discovery time on remand back to the Superior Court.)

trial date has not yet been fixed, a request made before the DED to extend discovery for an additional period should be granted if the movant presents "good cause" to do so. R. 4:24-1(c). By contrast, once an arbitration date or trial date has been fixed, the court may not extend the discovery period unless "exceptional circumstances" are shown. Ibid.

The Rules are designed to make a discovery extension substantially more difficult to obtain under the "exceptional circumstances" test, as opposed to the less-rigorous "good cause" test. See, e.g., Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 479-80 (App. Div. 2012) (discussing the important difference between exceptional circumstances and good cause). The provisions were adopted nearly two decades ago as part of a comprehensive set of rule changes "designed to improve the efficiency and expedition of the civil litigation process and to restore state-wide uniformity in implementing and enforcing discovery and trial practices." Vargas v. Camilo, 354 N.J. Super. 422, 425 n.1 (App. Div. 2002).

The logical distinction between the "good cause" standard and the "exceptional circumstances" standard is to discourage counsel and litigants from seeking to extend discovery at a late post-DED stage, unless there are truly exceptional reasons presented to prolong the pretrial process. If such late

A-0952-17T3

discovery requests are granted, arbitrations and trials will accordingly be delayed as well, thereby impeding the general goals of efficiency and expedition in civil cases. The pursuit of those time-oriented goals always must be tempered, however, with an appropriate concern for the goals of fairness and resolving cases on their merits with a sufficiently developed factual record. See Leitner v. Toms River Reg'l Sch., 392 N.J. Super. 80, 90-92 (App. Div. 2007) (recognizing the importance of both controlling dilatory litigation tactics while at the same time advancing the interests of justice and fairness); see also Santos v. Estate of Santos, 217 N.J. Super. 411, 416 (App. Div. 1986) (underscoring that litigants should receive "the full measure of justice due [to] them," quoting the admonition of Judge Wilfred Jayne that "expedition must supplant languor but never at the expense of justice.").

Plaintiff draws our attention to A Practitioner's Guide to New Jersey's Civil Court Procedure ("Guide"), which was issued by the State Judiciary in 2011. New Jersey Courts, A Practitioner's Guide to New Jersey's Civil Court Procedure (2011). The Guide provides "procedural guidance to practitioners in the New Jersey Superior Court, Law Division, Civil Part" and is intended to "promote uniform practices and procedures statewide." The Guide is non-binding. If there is a "conflict between [the Guide's] contents and any Rule or

14

statement of policy issued by the Supreme Court, the Judicial Council, or the Administrative Director of the Courts, that Rule or statement of policy, rather than [the Guide] will be controlling."

Section 16-2(c) of the Guide, which is titled "Notice of Trials," provides that: "At least 10 weeks' notice of trial must be provided by the court. The ten-week period is counted from the date of the receipt of the trial notice. The notice may not be sent prior to the discovery end date. See R. 4:36-3." Guide, §16-2(c) (emphasis added). Although the Guide references Rule 4:36-3, neither that Rule nor the published Comments to it codify these guidelines. We are mindful the guidelines are only suggestive, and are not mandatory. Nonetheless, they provide useful principles for our analysis here.

When a trial court, as here, sets a trial date before the DED has run, one major effect of doing so is to change the discovery extension standard for the duration of the case from the "good cause" standard to the "exceptional circumstances" standard. One advantage of that change is to provide trial date certainty and efficiency. However, one disadvantage is that the technique may pose too rigid an obstacle to extending discovery where pretrial activities have taken longer than may have been originally anticipated.

For instance, document turnover can get bogged down with privilege issues and compliance disputes. Deposition scheduling may be complicated by availability problems of witnesses and counsel. Expert reports may be delayed because the experts are awaiting the discovery materials and deposition testimony they need to formulate their opinions and generate reports for the litigation. The parties and counsel may be immersed in motion practice, mediation sessions, and settlement discussions. These are all natural and understandable difficulties that may arise during the pretrial period. When the court fixes a trial date before the DED, the litigants lose the opportunity to have the "good cause" standard available to them when reasonable needs to prolong discovery arise thereafter.

We do not intend here to treat Section 16-2(c) of the Guide as a mandate, or to impose it by this opinion as a matter of policy. There may well be situations where it is appropriate to establish a trial date early in the process and before the DED has run. For instance, the parties may mutually desire to have a case tried and decided before a certain date due to external business, tax, or regulatory concerns, or client preferences. Even so, the general approach recommended by the Guide appears to be sensible and fair.

A-0952-17T3

Having duly considered the record and the procedural history of this matter, we conclude the Law Division misapplied its discretion in declining to grant the unopposed first discovery extension requested by NBS. <u>Huszar v. Greate Bay Hotel & Casino, Inc.</u>, 375 N.J. Super. 463, 471-72 (App. Div. 2005) (applying the abuse of discretion standard to discovery extension rulings). We realize the DED was announced several times by the court in various notices. Even so, given the complexity of various issues in this case, and the many disputes that arose over document production and other pretrial matters, there was a legitimate need for the discovery period to be extended, in accordance with the agreed-upon deposition completion schedule that had been presented with NBS's unopposed motion to extend discovery.

The trial court should have been more receptive in entertaining that motion for a first extension. We recognize that NBS may have been largely responsible for pretrial delays by its own lack of full cooperation on certain discovery issues. Even so, the court might have addressed those problems with intermittent case management conferences, or with discovery sanctions such as cost-shifting. The unconditional denial of the first extension request was unreasonable.

Accordingly, we reverse the trial court's refusal to extend discovery under the particular circumstances presented in this case. We remand to reinstate this matter for a case management conference. That conference shall be held within thirty days, at which time the court will fashion with the input of counsel a fair and expeditious plan for the completion of discovery.

B.

We turn to the court's summary judgment rulings. In doing so, we apply the standards of Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), and Rule 4:46-2, and assess whether genuine issues of material fact exist, viewing the record as we must in a light most favorable to NBS. W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012).

As a threshold consideration, we note that it was improvident for the trial court to entertain the summary judgment motions at a point in time when plaintiff NBS, a corporation (or a division of a corporation), was without the representation of counsel as required by Rule 1:21-1(c). Counsel for plaintiff had withdrawn with the court's approval, and no substitute counsel had yet entered an appearance.

The form of order provided by withdrawing counsel was faulty because it did not specify a deadline for new counsel to enter an appearance. The omission

was unfortunate and ultimately prejudicial.  Regardless of whether counsel had a true conflict of interest, or whether the client thereafter had supplied a bona fide waiver of the disqualifying conflict, the court should have afforded NBS a reasonable opportunity to secure new counsel to enter the case and appear at an oral argument on these dispositive motions.  The motions were not actually "unopposed," despite the court's stamps that said so.  It was insufficient to treat former counsel's submissions as mere "courtesy copies."

There is no evidence that plaintiff tried to manipulate the court schedule by having its original counsel withdraw from the case based upon a contrived disqualification, a tactic we of course would repudiate.  That said, we do not fault the trial court for declining to accept at face value Levy's subsequent assertion that the unexplained disqualifying conflict somehow had been suddenly resolved and seeking to reinstate plaintiff's original counsel into the case.  Indeed, some attorney conflicts cannot be waived.  The problem is that the court pushed ahead to adjudicate the summary judgment motions, without first assuring the corporate plaintiff was duly represented in opposing the dispositive motions, including the right to oral argument.

That aside, we have performed our own de novo review of the summary judgment issues.  Having done so, we conclude that the only counts in plaintiff's

19

complaint that have any potential legal viability are counts three (alleged breach of a duty of loyalty by Master and Beringer) and nine (tortious interference by EPI with NBS's prospective business). The remaining counts are unsupportable, even accepting as true the factual assertions in plaintiff's submissions and Levy's deposition testimony. Plaintiff has not made a sufficient proffer under Rule 4:46-5 as to how additional discovery would reasonably uncover evidence to support those claims. See Hurwitz v. AHS Hosp. Corp., 438 N.J. Super. 269-307-08 (App. Div. 2014); Mohamed v. Iglesia Evangelica Oasis De Salvacion, 424 N.J. Super. 489-99 (App. Div. 2012).

That said, plaintiff's claim of an employee's breach of duty of loyalty does not require an oral or written agreement to be viable. The Supreme Court recognized in Lamorte Burns & Co., Inc., v. Walters, 167 N.J. 285, 302 (2001), that "[l]oyalty from an employee to an employer consists of certain very basic and common sense obligations. An employee must not while employed act contrary to the employer's interest." An employer may "prove a prima facie case of an employee's breach of the duty of loyalty not only by showing that the employee directly competed with the employer while employed, but also by showing that the employee while employed assisted the employer's competitor." Id. at 303 (citing Cameco, Inc. v. Gedicke, 157 N.J. 504, 517 (1999)). "Although

an employee has the right to make preparations to start a competing business, the employee may not breach the undivided duty of loyalty he or she owes to his or her employer while still employed by soliciting the employer's customers or engaging in other acts of secret competition." Ibid. (emphasis added) (citing Platinum Mgmt., Inc. v. Dahms, 285 N.J. Super. 274, 303 (Law. Div. 1995)).

In Cameco, 157 N.J. at 516, the Supreme Court recognized that a breach of loyalty claim generally requires a fact-specific analysis, explaining "[t]he scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship. Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks." In general "the adjudication of such claims summons rules of reason and fairness." Ibid. To guide trial courts, the Court identified four factors relevant to the determination of whether an employee-agent breached his or her duty of loyalty:

> (1) The existence of contractual provisions relevant to the employee's actions; (2) the employer's knowledge of, or agreement to, the employee's actions; (3) the status of the employee and his or her relationship to the employer, e.g., corporate officer or director versus production line worker; and (4) the nature of the employee's [conduct] and its effect on the employer.

> [Kaye v. Rosefielde, 223 N.J. 218, 230 (2015)
> (alteration in original) (citing Cameco, 157 N.J. at 521-
> 22).]

The non-existence of a written agreement is pertinent, but not necessarily a legal bar to a breach of loyalty claim. Indeed, the Court in Cameco and Kaye explained that the existence of "contractual provisions" is a relevant factor to be considered. This court has also observed:

> An employee who is not bound by a covenant not to compete after the termination of employment, and in the absence of any breach of trust, may anticipate the future termination of his employment and, while still employed, make arrangements for some new employment by a competitor or the establishment of his own business in competition with his employer. The only restriction to such action is that he may not solicit his employer's customers for his own benefit before he has terminated his employment. Nor may he do other similar acts in direct competition with the employer's business. This would constitute a breach of the undivided loyalty which the employee owes to his employer while he is still employed.
>
> [Auxton Comput. Enter., Inc. v. Parker, 174 N.J. Super. 418, 423-24 (App. Div. 1980) (emphasis added).]

Viewed in a light most favorable to NBS, Levy's certification and the accompanying email exhibits establish a genuine dispute of fact as to whether defendants Master and Beringer breached a duty of loyalty while still employed

22

at NBS, and whether defendant EPI aided and abetted that breach in a tortious manner. The following portions of the record illustrate that genuine dispute.

In an April 13, 2016 email to EPI staff discussing business strategy, Tom Corbett, president of EPI, requested Master and Beringer explain how "we got away from the 'ideal transition company plan' and to revisit this proposal and a plan to get back to these numbers which was the foundation of hiring the both of you." Attached to this email was a Power Point presentation titled "Ideal Transition Company & Plan" ("Transition Plan"). Apparently, the Power Point was created by Master and Beringer as a way of expressing interest in joining EPI.

The Transition Plan included the proposed salaries of Master and Beringer, as well as transition conditions, which included employing Master and Beringer and accepting "all transition business." Moreover, the Transition Plan had a slide titled "To Offer" which included in bullet points: "Shipping $3.2 MM in 2014 (15 customers); Budget to ship $3.6MM in 2015 and new additional projects worth $1.5MM in schedule; Personnel – engineering, sales, operations; Battery industry experienced people; Vendor relationships." Significantly, on a slide titled "Transition Timeline and Plan" it reads in bullet points: "[first quarter of 2015] – to consult with customers first; provide them with some additional

product as reserve during transition; provide new companies information for document change to customer; <u>get the customer's old [purchase order's] cancelled and new [purchase orders] placed with the new company</u>." (Emphasis added).

Although the Transition Plan was discovered because of a later April 2016 email exchange, it is clear from Corbett's email that the Transition Plan was created before defendants left NBS to go to EPI. Other email exhibits indicate that defendants had been discussing leaving NBS and going to EPI since May 2015.

The emails[5] suggest that while Master and Beringer were negotiating their future employment agreement with EPI, they also intended to solicit some of the customers they were working with at NBS. This is consistent with the Transition Plan, which discusses what Master and Beringer would "offer" to EPI in terms of clients and business. According to the Supreme Court in <u>Lamorte</u>, 167 N.J. at 303, "although an employee has the right to make preparations to start a competing business, the employee may not breach the undivided duty of loyalty

_____

[5] We reject the suggestion that these emails lack sufficient authentication to be considered on summary judgment. The materials were produced by EPI in discovery, and their distinctive contents reasonably support their authenticity. <u>See</u> N.J.R.E. 901; <u>State v. Hannah</u>, 448 N.J. Super. 78, 89-90 (App. Div. 2016).

he or she owes to his or her employer while still employed <u>by soliciting the employer's customers or engaging in other acts of secret competition</u>." (Emphasis added).

We also discern genuine issues of fact concerning whether NBS sustained damages from these alleged wrongful acts in diverting NBS's customers. The quantification of those losses is deferred to the course of discovery. Plaintiff claims it lost about $1 million in revenues the year after Master and Beringer left NBS. In addition, Corbett's email states those individual defendants had promised – apparently while they were at NBS – to bring fifteen customers to EPI. Viewed in a light most favorable to plaintiff, these alleged losses could represent compensable damages. For the present, there are sufficient indicia of lost business to warrant the reversal of summary judgment.

Accordingly, counts three and nine of the amended complaint are restored. Summary judgment as to the remaining counts is affirmed.

In sum, the trial court's rulings are reversed in part and affirmed in part. The case is remanded to the trial court to complete discovery and resume the litigation as to the discrete claims we have reinstated. Jurisdiction is not retained.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-0952-17T3