**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3609-18T2

K.F.,

    Plaintiff-Respondent,

v.

J.C.C.,[1]

    Defendant-Appellant.

_____

Argued January 23, 2020 – Decided November 6, 2020

Before Judges Fuentes and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FV-07-2450-19.

Bette R. Grayson argued the cause for appellant (Grayson & Associates, LLC, attorneys; Bette R. Grayson and Elena K. Weitz, on the briefs).

Montell Figgins, LLC, attorneys for respondent (Kenneth E. Brown, on the brief).

---

[1] Pursuant to Rule 1:38-3(d)(9), we use initials to identify the parties and the family members who testified before the Family Part to protect and preserve their privacy.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant J.C.C. and plaintiff K.F. lived together and were involved in a romantic relationship that lasted over five years. They had a daughter, K.C.F., who was born in 2018. On January 31, 2019, plaintiff filed a verified complaint against defendant in the Chancery Division, Family Part under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Plaintiff alleged defendant had been physically abusive "throughout the relationship." Plaintiff alleged defendant committed the predicate acts of harassment, N.J.S.A. 2C:33-4, simple assault, N.J.S.A. 2C:12-1(a), and terroristic threats, N.J.S.A. 2C:12-3.

The Family Part considered plaintiff's ex parte application, as authorized by N.J.S.A. 2C:25-28(i) and Rule 5:7A(a), and granted her a temporary restraining order (TRO) which, inter alia, prohibited defendant from having any contacts with plaintiff or his daughter pending the outcome of an evidentiary hearing for the issuance of a final restraining order (FRO).

A Family Part judge conducted the FRO evidentiary hearing on March 8, 2019. The parties were represented by private counsel. Plaintiff testified on her own behalf and each party also called a family member as a witness in their case.

Plaintiff presented the testimony of her father K.F., and defendant's sister A.C. testified on her brother's behalf. Defendant testified in his own defense.

The judge found plaintiff's testimony credible for the most part, and held plaintiff established, by a preponderance of the evidence, that defendant committed the predicate acts of harassment, N.J.S.A. 2C:33-4, and simple assault, N.J.S.A. 2C:12-1(a). The judge entered an FRO and permanently enjoined defendant from having any contacts with plaintiff at her residence or place of employment, awarded the parties joint legal custody of their two-year-old daughter K.C.F., and awarded plaintiff residential custody of the child. The judge also established a parenting time arrangement for defendant to enable him to have physical contact with his daughter, and directed the parties to communicate with defendant's sister via text "only in regards to the child."

In this appeal, defendant argues the Family Part judge: (1) "mischaracterized" the parties' history to "arbitrarily and capriciously" grant the FRO; (2) "incorrectly" inferred a sinister "meaning and intent" in text messages defendant sent to plaintiff regarding an incident that occurred in December 2018; (3) "arbitrarily and capriciously" treated defendant's failure to respond to a text message regarding this incident as "tantamount to an admission of guilt;" (4) "arbitrarily and capriciously" found plaintiff's testimony credible and

ignored defendant's and his sister's testimony; (5) did not apply the second prong of Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006); (6) improperly permitted plaintiff to testify about matters not mentioned in the PDVA complaint; and (7) did not rule on plaintiff's proffer and admitted evidence in violation of defendant's due process rights. None of these arguments have merit.

I

Plaintiff was the first witness to testify. In response to her attorney's questions, plaintiff explained that on December 2018 she, defendant, and his sister A.C. were in the house watching sports on television. Defendant's sister was seated on the couch with the baby, K.C.F., on her lap and defendant had his feet on the baby's chair. When plaintiff asked defendant to remove his feet from the baby's chair: "He said that he could do anything he wanted in that house, because he paid the bills . . . I'm not working." Plaintiff testified that she realized it was time to change the baby's diapers, and stood up to take the child to her room. Plaintiff described what occurred at this point:

> [H]e got out of the couch and stood in front of me. I had the baby on my right arm, and he grabbed me by the neck in a very aggressive way. I fell on the couch, the baby was falling over to the other side, and he wouldn't stop squeezing my neck. I tried to defend myself and I slapped him and I scratch at him over here, but he wouldn't stop choking me. And his sister got in

-- involved and she said leave her alone and she pull –
pushed . . . away.[2]

. . . .

When she manage to get him out of -- up when he was
on top of me, I still had the baby on my lap -- on my
arm. After she got him . . . away from me, he left for
several hours. Then he came back calmer.

The December 2018 incident led plaintiff to describe another event in which defendant again reacted with an unwarranted level of violence against plaintiff. This time, the incident involved a "shirt." Plaintiff provided the following description of what transpired:

> PLAINTIFF: The two of us were in our bedroom, the baby was asleep already. There was a dirty shirt, a long sleeve one, and all of a sudden he rolled it up and threw it on my chest with force. He made me cry, because I nurse my baby, and that hurt me a lot.
>
> PLAINTIFF'S COUNSEL. Okay. Do you remember why it hurt you so much?
>
> A. Yes, because that's the way I feed my baby, and since she was asleep I was full.

Plaintiff testified she decided to take her daughter and leave the residence she shared with defendant. Plaintiff testified that when she asked defendant

---

[2] The Family Part judge overruled defense counsel's objection to the statement attributable to defendant's sister as an "excited utterance" exception to the hearsay rule. N.J.R.E. 803(c)(2).

about paying child support, he told her that if she attempted to "file a case for child support, [she] was going to see the devil inside him." Plaintiff also said that defendant "wanted to talk about us," but she was resolved to end the relationship and leave. Plaintiff also testified about an incident at which defendant disrupted her mother's birthday party when he appeared at her mother's house intoxicated after consuming alcohol at another party. He tried to force plaintiff to go home with him, but her relatives intervened on her behalf. She believed that "the situation was escalating."

When her father attempted to call the police, she decided to go home with defendant "to calm down the whole thing." Plaintiff testified that she made this decision despite being "very afraid" because she did not know what defendant "was going to do when we got home[.]" Her main concern was to avoid a family fight on her mother's birthday. At this point at the FRO hearing, defendant's counsel objected to this testimony because plaintiff did not particularly mention this incident in her PDVA complaint. In response, the judge placed the following ruling on the record:

> . . . I know that the last testimony was given over . . . defendant's objection, which is noted. The [c]ourt is admitting it as contained within the notice before she was pregnant . . . defendant as both physically and verbally abusive. I do note that if the defense wants

more time to meet that testimony, I will certainly permit it.

Plaintiff next testified about an incident that occurred on September 2018, when her parents were on vacation. Plaintiff decided to stay in her parents' house over the weekend with her sister and her (plaintiff's) baby daughter. She went to sleep early that night. She left her cellphone in the kitchen, and was thus unaware of a number of text messages defendant had sent to her with "question marks." Plaintiff testified that defendant

> arrived at my house that night, my sister opened the door for him, and he went to the room where I was sleeping with the baby, <u>and at that moment he came in and he grabbed me by the neck again</u>. <u>And he pushed my head against the headboard of the bed</u>, and he said if -- he asked me if that's what I wanted from him?
>
> . . . .
>
> And I said no. <u>He grabbed me by the neck, and he banged my neck on the headboard, and he asked me if that's what I wanted from him? I told him no</u>. Then he said let's go home. And I was there and my sister, and I didn't want [my] sister to get involved, so I told him let's go. I put the baby on the car seat, she was asleep, and I left with him.
>
> [(emphasis added)]

Plaintiff went home with defendant that night. She made clear that she would have done anything "to make . . . to see him happy, so he wouldn't get angry at me."

Plaintiff also stated that at the start of their relationship, she did not want to have children with defendant. After approximately a year and a half of trying to conceive, plaintiff testified that defendant told her to see a physician "to check" herself because if she was unable to have children, he did not want to be with her. According to plaintiff, defendant did not discuss this sensitive topic with her in calm and supportive fashion. He would "scream at me."

Defendant's way of interacting with plaintiff did not improve when she became pregnant. Plaintiff testified that during her pregnancy her feet would swell and her doctor told her not to stand for long periods of time. According to plaintiff, defendant was utterly indifferent to her condition and would tell her to do "the housework and cook for him." He also demanded that plaintiff cook his eggs in particular way. Plaintiff descried an incident that occurred "when he came home and he saw how I fried the eggs in oil, he threw the plate against the door and he broke the plate and the door. And I went upstairs to the bedroom and started crying."

On cross-examination, defense counsel asked plaintiff to read into the record a number of text messages she sent to defendant after she stopped cohabitating with him. In these texts, plaintiff expressed a measure of regret for the way the relationship ended. For example, plaintiff wrote to defendant in one text: "I still see that these [sic] was not necessary." When defense counsel asked plaintiff to clarify when she meant to say, she responded: "That after everything we have been through . . . during this five years breaking it was not necessary, but we agreed on it." Plaintiff also wrote: "And even though it hurts me deeply, I accept it. And if one day you change your mind I am here, I'll always love you."

Defense counsel asked plaintiff if what she wrote in the text reflected how she felt at the time. Plaintiff responded that although she still loved defendant, she was afraid of him. She explained: "I have a child. He assaulted me twice in front of her. I don't want my daughter growing up seeing how her father abuses. . . her mother, and I think that . . . she will grow up thinking that that's right."

Plaintiff's father A.K. corroborated his daughter's testimony concerning defendant's state of intoxication when he arrived at plaintiff's mother's birthday party. Defendant claimed plaintiff had to be home early. According to A.K.,

"[e]verybody got involved.  I was very nervous."  A.K. testified that plaintiff left with defendant "so he would calm down."  This happened so abruptly that she "left her car, her telephone, everything in the house."  A.K. also claimed that defendant refused to sign the baby's birth certificate acknowledging his paternity because plaintiff wanted the child to have both his and her last names.

A.K. claimed that he witnessed defendant disparaged plaintiff and called her a "bitch."  When he asked defendant "why do you say that, why do you say that to her?  And he goes because that's what she is."  In response to plaintiff's counsel, A.K. testified that he saw defendant grabbed plaintiff by the hair while she was in the hospital and scream at her whenever she left A.K.'s house early.

Defendant's sister A.C. testified in her brother's defense.[3]  She testified she was present during the 2018 incident in which defendant put his feet on top of his infant daughter's rocking chair.  A.C. provided the following account of what occurred that day:

> My brother put his feet on top of the baby's rocking chair, [plaintiff] got highly upset and walked up towards me, which I was holding my niece at the time, grabbed the baby to take her away.  I don't know for what purpose or reason.  I know that she was very upset about the whole situation.  And my brother then went

---

[3] Because plaintiff had not technically rested her case at this juncture, the judge permitted defendant to call this witness "a little bit out of the standard order" as accommodation to the witness' child rearing responsibilities.

A-3609-18T2

to reach for the baby to give me the baby back, [plaintiff] scratched his face, he moved back, grabbed his keys[,] and left.

In response to defense counsel's question, A.C. stated that she did not see defendant push plaintiff down onto the sofa while she held the baby, nor grab her by the neck. According to A.C., when her brother left, she and plaintiff "sat there in awkward silent, [sic] and about ten minutes later my boyfriend came to pick me up and I left." On cross-examination by plaintiff's counsel, A.C. denied ever seeing defendant and plaintiff involved in any other physical altercation.

II

At the conclusion of plaintiff's case, defense counsel moved to dismiss plaintiff's PDVA complaint as a matter of law, based on insufficient evidence to satisfy the two-prong analytical paradigm in Silver, which requires the judge to perform two tasks before granting final relief under the PDVA. Silver, 387 N.J. Super. at 125. First, the judge must determine whether plaintiff proved, by a preponderance of the credible evidence, that defendant committed one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a). Ibid. "If the judge finds plaintiff did not meet this burden of proof, the court must dismiss the complaint." A.M.C. v. P.B., 447 N.J. Super. 402, 413 (App. Div. 2016). However, if the court finds a defendant committed one or more of the predicate

11

acts listed in N.J.S.A. 2C:25-19(a), the judge must then determine whether an FRO is needed to protect the victim. Silver, 387 N.J. Super. at 126.

In determining whether to grant a motion to dismiss at the close of a plaintiff's case, "a trial court generally should accept the truth of the plaintiff's evidence and accord the plaintiff the benefit of all favorable inferences that the evidence supports." Cameco, Inc. v. Gedicke, 157 N.J. 504, 515 (1999). Rule 4:37-2(b) further provides that in an action tried without a jury, "such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor."

Here, the judge found that plaintiff testified, consistent with the allegations she made in the PDVA complaint, that defendant threatened that she "would see the devil in him if she filed for child support." Plaintiff also testified that defendant threw a "balled shirt" at her chest at the time she was actively breastfeeding the baby. Plaintiff also testified that she had not nursed the child when defendant threw the balled shirt at her chest. This made her particularly sensitive and more likely to suffer pain when the shirt impacted her chest. Finally, the judge noted that plaintiff testified that the argument that began with defendant allegedly placing his feet on the child's seat quickly escalated to what plaintiff described as an assault on her person that included choking. Based on

this testimonial evidence, the judge denied defendant's motion to dismiss plaintiff's PDVA complaint. We hold the Family Part correctly applied the relevant standard of review to deny defendant's motion for a directed verdict.

III

Defendant testified in his own defense. He claimed he ended his romantic relationship with plaintiff because

> she went delusional after she had our baby. She changed, she . . . used to go, silent on me, she used to never speak to me. I used to try to talk to her you know once a month see how she was doing, then she would have nothing to say.

In response to his attorney's leading questions, defendant testified that he "offered to go to a therapist with her" and "take her on a vacation to try to see if it was postpartum depression." He testified that the three of them (plaintiff, the baby, and he) went on vacation for two weeks. Defendant denied: (1) ever discussing the topic of child support with plaintiff; (2) threatening plaintiff by saying "she would see the devil in him" if she were to seek child support; and (3) throwing his sweaty gym shirt at plaintiff's chest at the time she was actively nursing their child. In fact, he denied ever being physically abusive to plaintiff throughout their entire five-year relationship.

A-3609-18T2

Defense counsel also asked questioned defendant about the December 2018 incident, in which plaintiff claimed defendant put his feet on their infant daughter's rocking chair. He denied physically assaulting plaintiff that day, but conceded that he had his feet on the child's "rocker." He testified that plaintiff

> was upset, because I didn't take my feet off of the rocker, so she took my daughter away from my sister. I went at that moment trying to grab my daughter, like hey, can I have my daughter, give her back to my sister, and she went like crazy and just grabbed me by my neck, and scratched my face. And I looked at her, turned around, grabbed my keys[,] and left.

Defendant identified a photograph of his face allegedly taken that same day, which purportedly depicts a scratch on his face caused by plaintiff. He thereafter left the residence he shared with plaintiff for "a couple of days" and terminated their relationship at the end of January. According to defendant, although they were no longer living together nor romantically involved, he continued to stay in plaintiff's residence "during the weekends, Fridays, Saturdays and Sundays, because it's a three bedroom. So, Friday, Saturday and Sunday I'll stay there with my son, her, and my daughter."

Defendant also denied plaintiff's allegation that he intentionally threw a "balled shirt" at her chest at the time she was nursing the baby. Plaintiff's counsel addressed this claim on cross-examination by introducing as an exhibit

14

a text message defendant sent to plaintiff, which counsel claims states that "defendant apologizes for throwing the shirt at my client[.]" Defendant refuted this characterization of the content of text message: "It just says sorry for the shirt, which I gave her a sweaty shirt, and she felt disgusted because it was sweaty."

The judge reserved decision after hearing the attorneys' closing argument. He placed his factual findings and conclusions of law on the record five days later. After reviewing at length the testimonial evidence, the judge found plaintiff's version of the events within the relationship more credible than defendant's account. With respect to the incident with the shirt, the judge did not believe defendant sent a text message to plaintiff "apologizing for handing her a sweaty shirt." The judge also questioned the credibility of defendant's sister's testimony: "I believe his sister is attempting to protect her brother but her version of what occurred in the apartment is completely lacking in the type of detail that . . . plaintiff's [father's][4] testimony causes me to find also credible."

The judge found plaintiff

---

[4] The judge actually said, "plaintiff's mother's testimony." We conclude this was merely an inadvertent misstatement, since plaintiff's mother did not testify at the FRO hearing.

experienced a pattern of abusive and controlling behavior which injures the victim and as stated in the <u>Corrente v. Corrente</u>,[5] case is the type of behavior that the prevention of domestic violence act was formulated to respond to. The text that she sent on February 4th is a text in my estimation having seen and heard her testimony that the result of a cycle which does not exclude the plaintiff having genuine feelings and it appears to me quite a dependence emotionally on the defendant.

With respect to the December 2018 incident in which defendant conceded he placed his feet on the baby's rocker, the judge found, by a preponderance of the evidence, that defendant committed the predicate offense of simple assault as defined in N.J.S.A. 2C:12-1(a), when he put his hands around plaintiff's neck, and the petty disorderly person offense of harassment, in the form of an offensive touching. N.J.S.A. 2C:33-4(b). In the judge's own words:

[G]iven the credible credibility findings that I have made find that there is sufficient evidence to support the issuance of a final restraining order based on assault and based on harassment.

. . . .

[T]he hands-on neck after the argument over the feet on the rocker was an assault. It's also, of course, an offensive touching, harassment. I believe that while

---

[5] In <u>Corrente</u>, we cited psychological studies that described domestic violence as "a term of art which describes a pattern of abusive and controlling behavior which injures its victim." 281 N.J. Super. 243, 246 (App. Div. 1995).

> lesser in violence[,] the shirt was balled up and thrown at her chest. That's simple assault at most, also, an offensive touching under the harassment statute.

Under N.J.S.A. 2C:12-3(a), a person commits the third degree offense of terroristic threats if he or she: "threatens to commit any crime of violence with the purpose to terrorize another[.]" Here, the judge found insufficient evidence to conclude defendant committed the predicate offense of terroristic threats. "I believe that the immediacy and the specificity that the terroristic threat statute calls for is not met by the statement seeing the devil in me." The judge found that these predicate acts combined with the history of domestic violence between the parties was sufficient to warrant the issuance of an FRO.

"When the Legislature adopted the PDVA, it made the Judiciary responsible for 'protect[ing] victims of violence that occurs in a family or family-like setting by providing access to both emergent and long-term civil and criminal remedies and sanctions, and by ordering those remedies and sanctions that are available to assure the safety of the victims and the public.'" A.M.C. v. P.B., 447 N.J. Super. at 418 (quoting N.J.S.A. 2C:25-18). Here, the judge carefully reviewed the evidence presented by the parties at the FRO hearing, made detailed factual findings, and applied the two-prong analytical paradigm under Silver to conclude plaintiff was entitled to a permanent restraining order.

17

387 N.J. Super. at 127.   We discern no legal or factual basis to question the outcome of this case.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3609-18T2